725 P.2d 244

**NEW MEXICO INDUSTRIAL ENERGY CONSUMERS, Appellants,**

v.

**NEW MEXICO PUBLIC SERVICE COMMISSION, Appellee,**

and

**Public Service Company, Applicant-Appellee,**

and

**Texas-New Mexico Power Company, Intervenor-Appellee.**

No. 15790.

Supreme Court of New Mexico.

Aug. 25, 1986.

Campbell, Pica & Olson, Lewis O. Campbell, Max Shepard, Albuquerque, for appellants.

Steven Asher, Santa Fe, for Public Service Com'n.

Keleher & McLeod, Richard B. Cole, Robert H. Clark, Albuquerque, for Public Service Co.

Sutin, Thayer & Browne, Donald M. Salazar, Santa Fe, for Texas-N.M. Power Co.

Lewis O. Campbell, for amici curiae Large Power Users Coalition, N.M. Hotel-Motel Ass'n, N.M. Retail Ass'n, N.M. Restaurant Ass'n.

## OPINION

SOSA, Senior Justice.

This case concerns a decision by the New Mexico Public Service Commission (Commission) to develop a methodology to apply in future rate cases brought by the Public Service Company of New Mexico (PNM) to account for excess generating capacity. Appellant, New Mexico Industrial Energy Consumers (NMIEC), moved to intervene. All of the interested parties agreed to form a Task Force to study the problem and make recommendations to the Commission. The Task Force arrived at a Stipulation, which NMIEC did not sign. The Commission held a hearing and subsequently entered a Final Order approving the Stipulation.

NMIEC applied for rehearing. Because the Commission did not act on the application within the twenty days provided by statute, it was deemed denied as a matter of law. NMSA 1978, § 62–10–16 (Repl.Pamp.1984). NMIEC appeals to this Court. We affirm.

NMIEC raises three issues on appeal.

I. Whether the Commission deprived NMIEC of procedural due process of law;

II. Whether the Commission has approved a procedure that is contrary to established law; and

III. Whether there is substantial evidence in the record as a whole to support the decision of the Commission.

## BACKGROUND

PNM first proposed the "inventoried capacity methodology" with its application for a certificate of public convenience and necessity to construct a major transmission line, in NMPSC Case 1794, filed on January 21, 1983. The Commission bifurcated this case and docketed Case 1804 solely to consider the concept and consequences of inventorying.

NMIEC moved to intervene in Case 1804 on July 6, 1983. The Commission scheduled a hearing for September 26, 1983, limiting it to cross examination of PNM witnesses on their prefiled testimony. After four days, the hearing was recessed because of a year's delay in the projected completion dates for Units 1–3 of the Palo Verde Nuclear Generating Station (PVNGS), a principal source of PNM's excess capacity. The hearing was rescheduled for November 29, 1983. In the interim, both the Commission Staff (Staff) and the New Mexico Attorney General (AG) filed formal discovery requests, but NMIEC did not.

On November 8, 1983, the Staff moved to dismiss PNM's application as premature in light of the delayed construction. The Staff suggested instead creating a task force comprised of representatives of PNM, the Staff and Intervenors, to study the question of uncommitted capacity and propose an appropriate ratemaking methodology. The Commission approved a stipulation on January 19, 1984, whereby all the parties, including NMIEC, agreed to form such a task force and to report their con-

clusions by August 1, 1984, thus enabling the Commission to hold hearings and reach a final decision in the case no later than May 15, 1985.

The Task Force met at least monthly from February through November, 1984. NMIEC, through its attorneys, attended most of the meetings and participated in the free flow of information and analysis. At the request of Task Force members, including NMIEC, PNM prepared numerous studies to evaluate the different proposed methodologies.

In March, 1984, the Task Force began to discuss specific proposals and to evaluate them according to the group goal of balancing the interests of present and future ratepayers as well as PNM's shareholders. In fact, the members drafted a statement of principles to guide their deliberations. Foremost of these was the desire to ensure that ratepayer costs would be no higher than under the traditional methodology. A further objective was to provide PNM with incentives to resolve the uncommitted capacity situation and to prevent its recurrence. On October 9, 1984, NMIEC presented its own proposal for an inventorying methodology, one of five reviewed in depth by the task force. PNM analyzed the financial impacts of all the proposals, and presented them to the Task Force and to NMIEC's expert consultants. None of the proposals satisfied all the Task Force objectives and criteria.

On October 10, 1984, the Commission indicated that it preferred to receive a stipulation rather than a report from the Task Force, and proposed a form for such stipulation. By Order of November 7, 1984, the Commission scheduled a hearing on the matter for December 3, 1984.

On November 7, 8, and 9, 1984, the members of the Task Force convened to seek consensus on a Stipulation, which they drafted on November 13, 1984. The final version presented to the Commission made only minor changes in wording. On November 15 and 16, 1984, representatives of PNM met with attorneys for NMIEC to discuss the Stipulation, which was subse-

quently signed by all the Task Force members except NMIEC and the United States Executive Agencies (USEA).

On November 20, 1984, the Commission ordered PNM to submit its prefiled testimony by November 26, 1984, and ordered the Staff and Intervenors to prefile their testimony by November 30, 1984. On November 30, 1984, NMIEC filed a motion to vacate the hearing scheduled for December 3, 1984, on the grounds that the hearing date set by the Commission denied NMIEC due process of law by not allowing NMIEC an opportunity to prepare and present rebuttal testimony.

The Commission heard and denied NMIEC's motion at the outset of the hearing on December 3, 1984. NMIEC remained at the hearing, but presented no testimony nor alternatives to the proposed Stipulation. On December 12, 1984, the Commission entered its Final Order in Case 1804, approving the Stipulation and adopting the inventorying methodology proposed by the Task Force. On January 11, 1985, NMIEC filed its application for rehearing, which was not granted, and consequently was deemed denied by operation of law on January 31, 1985. NMIEC then appealed to this Court.

## I. DUE PROCESS

NMIEC bases its claim here on two points: First, that it was denied the right to conduct discovery; and second, that it was not allowed sufficient time to prepare expert rebuttal testimony.

At the outset, we observe that the proceeding below was unique, both in the problem it addressed and in the solutions which evolved. For the purposes of discussion, we assume, but do not decide, that NMIEC has a constitutionally protected interest in a "methodology," even though present rates are unaffected thereby, and NMIEC will possess the full panoply of procedural rights of intervention in subsequent rate hearings, whenever the inventoried capacity comes on line.

Having identified the property interest, we must determine what process is due it.

*Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The cases cited by NMIEC confirm that due process is a flexible concept whose essence is the right to be heard at a meaningful time and in a meaningful manner. *See, e.g., Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *see also State v. Valdez,* 88 N.M. 338, 540 P.2d 818 (1975). Appellee PNM argues that the instant action is closer to a rule-making than to an adjudicatory proceeding, as elucidated in *United States v. Florida East Coast Railway Co.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). We agree with this distinction, although it is not essential to our disposition of this appeal. Instead, turning to the particular facts and circumstances below, we hold that the Commission, in approving the Stipulation, did afford NMIEC procedural due process.

### A. Discovery

 NMIEC contends that express denial of the right to conduct discovery results in a denial of procedural due process of law, citing *Hahn v. County Assessor for Bernalillo County [Matter of Miller],* 88 N.M. 492, 542 P.2d 1182 (Ct.App.), *cert. denied,* 89 N.M. 5, 546 P.2d 70 (1975). This is a correct statement of the law. NMIEC is incorrect in invoking this precept, however, because it has not demonstrated that it was, in fact, denied the opportunity to conduct discovery. It has pointed to no act of the Commission which could have effected such a denial.

NMIEC bases its argument on the claim that the Task Force investigation was not an adversarial proceeding and thus formal discovery procedures were unavailable. Yet NMIEC does not reveal any event of record which superseded or nullified its continuous opportunity to demand discovery, pursuant to the Second Revised General Order Number 1, Rules of Practice and Procedure of New Mexico Public Service Commission, Rule 15–1.

Furthermore, this Court is unimpressed with NMIEC's attempt to disparage the procedural adequacy of the Task Force de-liberations. Rather, we choose to commend the Commission for creating and implementing a new process for addressing a complex problem. Indeed, we agree with appellees that such a cooperative approach may be more effective in reconciling the interests of all the parties than would the polarization which often accompanies adversarial proceedings. The record reflects that PNM in this instance did all that was requested of it to facilitate the search of the Task Force for a fair result. NMIEC did not demonstrate to the Commission nor to this Court what, specifically, it could have gained from formal discovery which was not otherwise available through the Task Force.

### B. Time to Prepare Expert Testimony

 Here NMIEC contends that the Commission allowed it only twenty-three days to prepare expert testimony to rebut the proposed Stipulation, and only three days to address the prefiled testimony of PNM. While this is literally true, it does not support the conclusion urged by NMIEC that it was surprised by the testimony, or that the Commission, in its "rush to judgment," denied NMIEC its right to be heard.

For one thing, many of the "assumptions" NMIEC challenges were presented in at least rudimentary fashion as early as the original adversarial hearings, in which NMIEC participated, more than a year before. In the course of that year, NMIEC, as a member of the Task Force, was as well apprised as anyone could be of the evolution of the expert testimony. Indeed, by October, 1984, NMIEC was able to submit to the Task Force its own proposal, prepared by its own experts. Yet NMIEC chose not to submit that testimony at the final hearing (see Point III below).

The case law cited by NMIEC is unavailing. For example, the decision of this Court in *Hobbs Gas Co. v. New Mexico Public Service Commission,* 94 N.M. 731, 616 P.2d 1116 (1980) concerned an outright denial by the Commission of the opportunity to present expert rebuttal testimony.

Here, although the Attorney General and other intervenors timely prepared rebuttal testimony, NMIEC's failure to do so was entirely of its own choosing.

On this question, as on the alleged denial of discovery discussed above, NMIEC appears to have relied on its expectation arising from the original stipulation creating the Task Force. There the parties agreed that:

> The task force shall report to the Commission as to its conclusions no later than the first day of August, 1984, and the Commission shall schedule hearings thereafter to accept testimony and allow for examination of witnesses, by the parties to Case 1804, to enable the Commission to make a final decision by the 15th day of May, 1985.

From this language NMIEC would extract "a clearly stated procedural schedule," according to which NMIEC expected to have from August to May to conduct discovery and prepare for formal, adversarial proceedings. Evidently NMIEC would fault the Commission for coming to a decision well in advance of this self-imposed deadline. Yet NMIEC would also have it both ways, inasmuch as after the deadline of August 1, it did not initiate discovery nor prepare rebuttal testimony, although it could have foreseen the direction that the Task Force was heading. After months of access to virtually all the information which went into the Stipulation and the prefiled testimony of PNM, NMIEC made the strategic decision to petition the Commission for a continuance of indefinite duration, with no specific showing of what additional facts would be introduced nor how any such facts would contribute to the outcome.

Finally, NMIEC both received and employed the opportunity at the December 3, 1984 hearing to cross-examine witnesses in an adversarial proceeding. In light of all the above circumstances, NMIEC has failed to demonstrate to this Court that the Commission abused its discretion by refusing to grant an indeterminate continuance. Nor has NMIEC demonstrated the due diligence required by case law for such a continuance to be granted. *See El Paso Electric v. Real Estate Mart, Inc.*, 98 N.M. 490, 650 P.2d 12 (Ct.App.), *cert. denied* 98 N.M. 590, 651 P.2d 636 (1982).

## II. LEGALITY OF INVENTORYING

On this point, NMIEC contends that the Commission, in approving the Stipulation, failed to follow the "used and useful" standard in evaluating investments made by public utilities. NMIEC argues that excess capacity can meet this standard only upon a showing that the decision to build the plant was prudent when made. NMIEC argues that the Commission made no such findings, and, therefore, it erred in adopting the inventorying Stipulation.

We find this argument unconvincing, both in law and in fact. By statute the Commission is to decide whether to include utility property in the rate base in light of a broad context of facts and circumstances:

> When in the exercise of its powers and jurisdiction it is necessary for the commission to consider or ascertain the valuation of the properties or business of a public utility, or make any other determination involved in the fixing or setting of rates for a utility, the commission shall give due consideration to the history and development of the property and business of the particular public utility, to the original cost thereof, to the cost of reproduction as a going concern, to the revenues, investment and expenses of the utility in this state and otherwise subject to the commission's jurisdiction and to other elements of value and rate-making formulae and methods recognized by the laws of the land for rate-making purposes.

NMSA 1978, § 62–6–14(A) (Repl.Pamp. 1984).

Our case law confirms that the "used and useful" concept is but one factor among many to be considered by the Commission in its rate base analysis. We have consistently construed the statute broadly rather than to limit the Commission to any one particular method; the touchstone is

the reasonableness of the ultimate decision. *Hobbs Gas*, 94 N.M. at 734, 616 P.2d at 1119 (1980). NMIEC has failed to show how the Commission may have abused its discretion by the manner in which it adopted the proposed Stipulation.

Secondly, even accepting NMIEC's premises, we note that NMIEC has not challenged the Commission's Finding No. 4, which states explicitly that PNM's decisions to construct these additional plants were reasonable when made and had previously received approval by the Commission. This finding clearly meets the "prudent management" contention claimed by NMIEC.

■ Finally, the very essence of the inventorying concept is that the expense of new plant construction will be deferred in "inventory," and will only be added into the rate base as the generating capacity comes into actual service. At that time, moreover, the Commission will again hold hearings to assure that the new rates are "just and reasonable." NMSA 1978, § 62–8–1 (Repl.Pamp.1984). In other words, inventorying guarantees that ratepayers will only pay for construction that is used and useful.

### III. SUBSTANTIAL EVIDENCE

NMIEC challenges four of the Commission's findings, all of which relate to the balance struck by the Stipulation between the interests of PNM shareholders on one side and present and future ratepayers on the other. NMIEC stresses the importance of this Court's recent decisions that our review of Commission decisions must be based upon substantial evidence in the record as a whole. *Gonzales v. Public Service Commission of New Mexico* 102 N.M. 529, 697 P.2d 948 (1985). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rinker v. State Corporation Commission*, 84 N.M. 626, 627, 506 P.2d 783, 784 (1973). Finally, "this Court must view the evidence in the light most favorable to the decision made by the Commission." *Attorney General of the State of New Mexico v. New Mexico Public Service Commission*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984).

From this perspective, the fatal flaw in NMIEC's appeal is the fact that all the evidence introduced at the December 3, 1984 hearing supported the Commission's findings. Moreover, this Court consistently defers to the expertise of the Commission in ratemaking matters. *Id.*

■ Nevertheless, NMIEC contends that the Commission's findings are clearly erroneous because they rest upon incorrect "assumptions." The first allegation of error is that the stipulation shows savings to ratepayers in comparison to what would happen if all of the excess capacity were included in the rate base upon completion of construction, as under the traditional methodology. Admitting that the traditional methodology would cause "rate shock," NMIEC argues instead that there is no substantial evidence that the Commission would have approved the inclusion of new plant construction into the rate base. Yet the uncontradicted testimony is that, if inventorying were disallowed, PNM would have sought to include its entire investment in excess plant in the rate base immediately upon completion of construction. The Commission clearly considered this possibility and possessed the legal authority to adopt such a proposal. The decision of the Commission was that inventorying is more in the interest of ratepayers than either including in, or disallowing from the rate base, PNM's excess capacity. This decision is supported by substantial evidence.

■ Secondly, NMIEC challenges certain details and tax consequences of the limitations imposed by the Stipulation on how much investment can be added to the inventoried capacity. NMIEC contends that the Commission calculated incorrectly concerning the provisions for incentive sales by PNM and the "cap" on the percentage of investment to be inventoried each year. Again, NMIEC introduced no evidence into the record on these points—and we decline

to convert this appeal into a contest on the merits. In any event, we determine that the Commission's findings on this point are also supported by substantial evidence.

 Finally, NMIEC challenges the Task Force projections of future demands and costs, when such numbers are unknowable, arguing that thus the Commission might unfairly burden future ratepayers. At bottom, NMIEC is arguing that its own proposal presents a more preferable apportionment of the risks and benefits of inventorying. NMIEC's proposal, rejected by the Task Force in October, 1984, would result in greater savings to ratepayers than would the Stipulation adopted by the Commission, but those savings would come at the expense of drastically greater exposure to PNM's shareholders. NMIEC would save ratepayers 491 million dollars, but shareholder losses could be as high as 372 million dollars. In comparison, the Stipulation would still save ratepayers 339 million dollars with a potential shareholder loss of only 42 million dollars. We conclude that there is substantial evidence in the record as a whole to support the balancing of interests adopted by the Commission.

For the foregoing reasons, the decision of the Commission is affirmed.

STOWERS and WALTERS, JJ., concur.