2007-NMSC-053

168 P.3d 105

**NEW MEXICO INDUSTRIAL ENERGY CONSUMERS, Appellant,**

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION, Appellee,**

and

**El Paso Electric Company, Real Party in Interest.**

No. 29,633.

Supreme Court of New Mexico.

Aug. 28, 2007.

Steven S. Michel, Peter Jude Gould, Santa Fe, NM, for Appellant.

Carol Smith Rising, Santa Fe, NM, for Appellee.

Law Office of Randall W. Childress, P.C., Randall W. Childress, Stacey J. Goodwin, Santa Fe, NM, for Real Party in Interest.

**OPINION**

SERNA, Justice.

{1} Pursuant to the Renewable Energy Act ("REA"), NMSA 1978, §§ 62–16–1 to–10 (2004, prior to 2007 amendment), El Paso Electric Company ("EPE") purchased Renewable Energy Certificates ("RECs") representing renewable energy generated by Public Service Company of New Mexico ("PNM"); however, EPE did not purchase the actual renewable energy represented by the RECs. Pursuant to the REA, Section 62–16–6(A), EPE sought recovery of the REC costs through its automatic adjustment clause, *see* NMSA 1978, § 62–8–7(E) (2003). The Public Regulation Commission ("Commission") approved this form of cost recovery in a Final Order on Recommended Decision ("Order"). NMPRC Case No. 05–00231–UT. New Mexico Industrial Energy Consumers ("NMIEC") appealed the Order directly to this Court. *See* NMSA 1978, § 62–11–1 (1993).

{2} For the following reasons, we hold that EPE's REC costs are not eligible for automatic adjustment clause recovery. Accordingly, the Commission's Order is unlawful and hereby vacated. We remand to the Commission for proceedings in accordance with this Opinion.

**I. RENEWABLE ENERGY ACT**

{3} The Renewable Energy Act entered into effect on May 19, 2004. Section 62–16–

1, note. Pursuant to Section 62–16–7, the Commission adopted Rule 572, implementing the REA. *See* 17.9.572 NMAC. The REA requires public utilities [1] to include renewable energy as part of their electric energy supply portfolios. Section 62–16–4(A). Beginning January 1, 2006, renewable energy must comprise "no less than five percent of each public utility's total retail sales to New Mexico customers." Section 62–16–4(A)(1). This requirement is called the Renewable Portfolio Standard ("RPS"), and it increases by one percent each year until January 1, 2011, when it will reach ten percent of each public utility's annual retail sales in New Mexico. Section 62–16–4(A)(2).

{4} Utilities must establish their compliance with the Renewable Portfolio Standard by filing Renewable Energy Certificates with the Commission. Section 62–16–5(A) (directing the Commission to establish a system of RECs); 17.9.572.13 NMAC (stating that utilities must establish their annual compliance with the Renewable Portfolio Standard "through the filing of [R]enewable [E]nergy [C]ertificates with the [C]ommission"). Rule 572 defines a Renewable Energy Certificate as "a document evidencing that the enumerated renewable energy kilowatt-hours have been generated from a renewable energy generating facility." 17.9.572.7(E) NMAC. Each REC must have "a minimum value of one kilowatt-hour of renewable energy represented by the certificate for purposes of compliance with the [R]enewable [P]ortfolio [S]tandard." Section 62–16–5(A). RECs

may be traded, sold or otherwise transferred by their owner to any other party; provided that the transfers and use of the certificate by a public utility for compliance with the renewable energy portfolio standard shall require the electric energy represented by the certificate to be contracted for delivery in New Mexico.

Section 62–16–5(B)(1)(b). Rule 572 adds that "transfers and use of the [Renewable Energy] [C]ertificate by a public utility for compliance with the [R]enewable ... [P]ortfolio [S]tandard do not require physical delivery of

the electric energy represented by the certificate to a public utility." 17.9.572.13(B)(2) NMAC. Thus, compliance with the RPS provision of the REA can be established through RECs representing renewable energy the utility itself has generated; renewable energy the utility has purchased from another source; or renewable energy generated and contracted for delivery in New Mexico without the utility itself purchasing the energy. To ensure that compliance costs are reasonable, the REA requires that each year until 2012, and if necessary thereafter, public utilities file for the Commission's approval a report on their purchases of renewable energy during the prior calendar year as well as a procurement plan. Section 62–16–4(D)–(E).

{5} The REA authorizes public utilities to recover the reasonable costs of compliance with the REA "through the rate-making process." Section 62–16–6(A) states:

A public utility that procures or generates renewable energy shall recover, through the rate-making process, the reasonable costs of complying with the renewable portfolio standard. Costs that are consistent with commission approval of procurement plans or transitional procurement plans shall be deemed to be reasonable.

The REA does not define the "rate-making process."

{6} A related statute, the Public Utility Act ("PUA"), NMSA 1978, § 62–13–1 (1993), grants the Commission "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations." NMSA 1978, § 62–6–4(A) (2003). In order to change or increase rates, a utility normally must go through a notice, hearing, and approval process. Section 62–8–7(A)–(E). However, utilities can recover certain costs—"taxes or cost of fuel, gas or purchased power"—automatically through an automatic adjustment clause. Section 62–8–7(E). The Commission adopted Rule 550, 17.9.550 NMAC, regarding the implementation, oversight, and maintenance of automatic adjustment clauses, pursuant to Section 62–8–7(E).

---

1. A public utility is "an entity certified by the [C]ommission to provide retail electric service in New Mexico pursuant to the Public Utility Act

[62–13–1 NMSA 1978] but does not include rural electric cooperatives." Section 62–16–3(B).

## II. FACTS AND PROCEDURAL BACKGROUND

{7} In 2004, El Paso Electric Company obtained Commission approval of its 2004 renewable energy transitional procurement plan ("2004 Plan"), pursuant to Section 62–16–4(D)–(E) and Rule 572. EPE sought to comply with the Renewable Portfolio Standard by purchasing Renewable Energy Certificates, without taking physical delivery of the associated energy, from Public Service Company of New Mexico. In its 2004 Plan, EPE proposed to recover the costs of complying with the REA through its automatic adjustment clause. *See* § 62–8–7(E). The Commission approved EPE's 2004 Plan; however, the Commission deferred the issue of the appropriate mechanism for cost recovery to this case. Final Order, NMPRC Case No. 04–00306–UT.

{8} On September 1, 2005, EPE filed its 2005 renewable energy procurement plan ("2005 Plan"), which contained the specific REC contract with PNM as well as the costs EPE sought to recover through the automatic adjustment clause. NMPRC Case No. 05–00355–UT. In the instant proceeding, EPE sought Commission approval, on a permanent basis, of the automatic adjustment clause as the mechanism for recovering all costs of the purchased RECs under its approved Plan. In support, EPE filed testimony of its witness Steven P. Busser, contending that automatic adjustment clause recovery is appropriate under the REA, the PUA, and Commission Rules 572 and 550, and is the most reasonable mechanism for recovery of REA compliance costs. According to Busser, automatic adjustment clause recovery (i) would allow EPE to recover costs on a per kilowatt-hour basis; (ii) would be the least costly recovery mechanism, resulting in the lowest costs to EPE customers; (iii) would most timely allow one hundred percent of net proceeds from the sale of any excess RECs to be credited back to customers (although EPE does not intend to purchase RECs in excess of its REA compliance requirements); and (iv) was authorized by EPE's Stipulation and Final Order in its last rate case. The Commission also filed testimony, which staff witness Charles W. Gunter, a Utility Economist for the Utility Division of the Commission, adopted, in support of EPE's proposed automatic adjustment clause recovery, concluding that it (i) is the most appropriate method of cost recovery; (ii) is authorized by the REA and PUA; and (iii) will result in the lowest cost to EPE customers. NMIEC, Western Water and Power Production Limited, the Coalition for Clean Affordable Energy, and New Mexico State University ("NMSU") filed motions to intervene in the proceeding.

{9} The Commission held a public hearing on October 26, 2005, at which EPE witness Busser and Commission witness Gunter testified in favor of automatic adjustment clause recovery of EPE's REC costs. NMIEC and NMSU cross-examined the witnesses to establish that RECs are not "purchased power" under the PUA, and thus their costs cannot be recovered automatically through the automatic adjustment clause.

{10} On December 8, 2005, the Commission issued a Final Order, which concluded that automatic adjustment clause recovery is the appropriate method for recovery of EPE's REC costs. In reaching its decision, the Commission first determined that automatic adjustment clauses are part of the "rate-making process," contemplated in Section 62–16–6(A), based on (i) a previous Commission determination that they are (NMPRC Case No. 04–00334–UT) and (ii) Commission Rule 572, which "expressly recognizes the [automatic adjustment clause] may be used as part of a utility's rates for renewable cost recovery." Next, the Commission explained that it has "wide latitude to determine that the cost of purchasing or acquiring RECs are purchased power costs" because the PUA "grants the Commission 'latitude' and 'discretion' to include costs closely related to the broad categories of purchased power." *See* § 62–8–7. The Commission noted that it has previously allowed automatic recovery of gas hedging costs, "which demonstrate[s] the breadth of the Commission's authority to determine which costs to include in the adjustment clauses." The Commission agreed with EPE that "[b]ecause RECs are a requirement of EPE's energy supply mix, their cost is a purchased power cost." Thus, "[c]haracteriz-

ing RECs in this way, as 'part of the overall cost' of energy, is consistent with Commission precedent and with the express provisions and REC requirements of the REA."

{11} The Commission went on to determine that, as a policy matter, it should not treat cost recovery differently for RECs with delivered energy and RECs without delivered energy because both require generation of renewable energy which must be contracted for delivery in New Mexico. The Commission reasoned that "[a] utility should not be adversely affected through the ratemaking process for its renewable energy procurement decisions," especially in this case because EPE (i) chose to comply with the REA by purchasing RECs without the accompanying energy because they were "the lowest cost option for its customers" and (ii) sought automatic adjustment clause recovery of the REC costs as "the most economical means to recover the cost of compliance with the Act." The Commission stated that cost recovery of RECs through the automatic adjustment clause "makes a great deal of sense" because "RECs are an integral part of purchased power and are created and come about because renewable power is generated . . . [and] do not exist without actual renewable energy generation that is contracted for delivery in New Mexico."

{12} Finally, the Commission determined, after examining the two other cost recovery alternatives, a separate rate rider or deferral of REC costs with carrying charges, that automatic adjustment clause recovery is the "proper and most efficient method of rate recovery." The Commission concluded that automatic adjustment clause recovery "will best assure that costs are recovered concurrently with their expenditure, on an equitable [kilowatt-hour] basis, and it will avoid additional costs associated with other collection alternatives. Recovery through the [automatic adjustment clause] results in the lowest cost collection from customers." The Commission found these to be "compelling" reasons for automatic adjustment clause recovery of REC costs. While NMIEC contended that automatic adjustment clause recovery of REC costs would compromise the Commission's ability to address the prudence of EPE's REC procurement, the Commission found numerous safeguards exist to address such concerns, including monthly and annual reporting as well as automatic adjustment clause reconciliation and continuation filings. As part of the Order, the Commission granted a variance that would add separate line items to EPE's monthly Rule 550 Reports "to separately track REC costs and potential credits" recovered through the automatic adjustment clause.

## III. STANDARD OF REVIEW

■ {13} We review administrative orders to determine whether "the [Commission]'s decision is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law," *Dona Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006–NMSC–032, ¶ 9, 140 N.M. 6, 139 P.3d 166, with the burden on the appellant to make this showing, *see* NMSA 1978, § 62–11–4 (1965). In reviewing the Commission's decision, we "begin by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 582, 904 P.2d 28, 31 (1995).

## IV. DISCUSSION

{14} NMIEC appeals the Final Order of the Commission directly to this Court, pursuant to Section 62–11–1. NMIEC argues that the Final Order should be vacated on the ground that it is unlawful because it allows for recovery of EPE's REC costs through EPE's automatic adjustment clause, even though RECs do not constitute "purchased power" or any of the other specific costs which Section 62–8–7(E) authorizes for automatic cost recovery. NMIEC goes on to argue that the Commission exceeded its authority by finding that RECs are "closely related to" purchased power, when EPE purchased only the RECs and not the associated power that they represent, and are thus inappropriate for automatic adjustment clause

recovery. The Commission's logic, according to NMIEC, renders the limitation language in Section 62–8–7(E)—"taxes or cost of fuel, gas or purchased power"—meaningless and would lead to the unreasonable result of "virtually any utility cost [being] 'related to' purchased power and therefore eligible for [automatic adjustment] clause recovery."

{15} The Commission and EPE, on the other hand, argue that this appeal centers on the question of substantial evidence in the record to support the Commission's Order, which they contend is within the Commission's broad rate-setting authority and discretion. The Commission advocates a two-step review. According to the Commission, we must first decide "whether the Commission's determination that RECs are closely related to purchased power costs in the context of the [REA] was supported by substantial evidence in the record and was within the Commission's authority." Next, we "must establish whether, after the Commission determined that RECs are closely related to purchased power costs in the context of the REA, it acted within its authority and rate-making discretion by deciding that those costs are properly recoverable through a[n] [automatic] adjustment clause."

{16} The Commission begins by explaining that the exclusive method of complying with the REA is through the filing of RECs with the Commission, and that the REA does not require utilities to purchase the accompanying power in order to comply. The REA provides for recovery of the reasonable costs of compliance through the "rate-making process," and the Commission contends that it has broad discretion in setting rates, and that it has already determined that automatic adjustment clauses are part of the rate-making process. Therefore, since the Commission has determined that RECs, even without the purchase of energy, are "closely related to purchased power," in its discretion, the Commission can allow for REC cost recovery through EPE's automatic adjustment clause, in the same way it has previously allowed for such recovery of costs like gas hedging agreements, which likewise are not specifically enumerated in Section 62–8–7(E). El Paso Electric, the Real Party in Interest,

also submitted a brief in which it makes essentially the same argument as the Commission.

{17} We view this case as involving two related questions. First, we are confronted with a matter of pure statutory interpretation, wherein we must determine the "rate-making process" contemplated in Section 62–16–6(A) of the REA. Based on the following analysis, we conclude that the "rate-making process" includes both rate cases and automatic adjustment clauses. Second, we review whether substantial evidence supports a finding that EPE's REC costs constitute "purchased power" or, in the alternative, whether the Commission had the authority to allow for automatic recovery of EPE's REC costs by determining that they are "closely related to purchased power."

## A. THE "RATE–MAKING PROCESS" CONTEMPLATED BY THE REA INCLUDES BOTH GENERAL RATE CASES AND AUTOMATIC ADJUSTMENT CLAUSE RECOVERY, DEPENDING ON THE TYPE OF COST INVOLVED

{18} The REA authorizes public utilities to recover the reasonable costs of compliance thereto through "the rate-making process." Section 62–16–6(A). As a threshold matter, we note that EPE's REA compliance costs are presumed reasonable, as the Commission approved EPE's 2004 and 2005 Plans. Thus, we must determine what constitutes "the rate-making process" referred to in Section 62–16–6(A).

{19} Statutory interpretation is an issue of law, which we review de novo. *Pub. Serv. Co. of N.M. v. N.M. Pub. Util. Comm'n,* 1999–NMSC–040, ¶ 14, 128 N.M. 309, 992 P.2d 860 (quoting *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995)). We will reverse the agency's interpretation of a law if it is unreasonable or unlawful. NMSA 1978, § 62–11–5 (1982); *Morningstar Water Users Ass'n,* 120 N.M. at 583, 904 P.2d at 32. Where as here an agency is construing the same statutes by which it is governed, we accord some deference to the agency's interpretation. *Morningstar Water Users Ass'n,* 120 N.M. at 583,

904 P.2d at 32. The deference we accord the agency's interpretation depends on the legal question involved. As we have explained in the past,

> [t]he court will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function. However, the court is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law.

*Id.* (internal citations and quotations marks omitted). Because statutory construction itself is not a matter within the purview of the Commission's expertise, "we afford little, if any, deference to the Commission on this matter." *Pub. Serv. Co. of N.M.*, 1999-NMSC-040, ¶ 14. Indeed, we are troubled by the multiple references, at the Commission hearing, in the Commission's and EPE's briefing, and at oral argument, to the legal conclusions of Commission staff with respect to matters of statutory construction as well as the Commission's apparent reliance on those legal conclusions in its Final Order.

{20} When construing statutes, our guiding principle is to determine and give effect to legislative intent. *Id.* ¶ 18. In ascertaining the Legislature's intent, we are aided by classic canons of statutory construction. *Id.* We look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended. *Id.* In addition, we strive to read related statutes in harmony so as to give effect to all provisions:

> In ascertaining legislative intent, the provisions of a statute must be read together with other statutes in pari materia under the presumption that the legislature acted with full knowledge of relevant statutory and common law.... Thus, two statutes covering the same subject matter should be harmonized and construed together *when possible,* in a way that facilitates their operation and the achievement of their goals.

*Id.* ¶ 23 (quoting *State ex rel. Quintana v. Schnedar,* 115 N.M. 573, 575–76, 855 P.2d 562, 564–65 (1993)).

{21} We thus begin with the plain language of Section 62–16–6(A) to ascertain the legislative intent. The Legislature did not define or specify "the rate-making process" in the REA, so we look to a related statute, the PUA, to inform the meaning of Section 62–16–6(A). The Legislature, through the PUA, has granted the Commission "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations." Section 62–6–4(A). In Section 62–8–7 of the PUA, entitled "Change in rates," the Legislature set forth the framework for setting and changing utility rates. *See Otero County Elec. Coop., Inc. v. N.M. Pub. Serv. Comm'n,* 108 N.M. 462, 464, 774 P.2d 1050, 1052 (1989). Section 62–8–7(E) states, in pertinent part: "Except as otherwise provided by law, any increase in rates or charges for the utility commodity based upon cost factors other than taxes or cost of fuel, gas or purchased power ... shall be permitted only after notice and hearing as provided by this section." Thus, the normal process a utility must follow for setting or changing its rates includes a notice, hearing, and approval process. However, utilities can recover specifically enumerated costs automatically through an automatic adjustment clause.

{22} Reading the related provisions of the REA and the PUA together, we agree with the Commission and conclude that by "rate-making process" in Section 62–16–6(A) of the REA, the Legislature meant the process set forth in Section 62–8–7 of the PUA, i.e., both general rate cases involving a Commission notice, hearing, and approval process as well as automatic adjustment clauses, depending on the type of cost involved.

**B. EPE's REC COSTS CANNOT BE RECOVERED THROUGH ITS AUTOMATIC ADJUSTMENT CLAUSE**

**1. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT A FINDING THAT RECs, UNACCOMPANIED BY THE PURCHASE OF THE RENEWABLE ENERGY THEY REPRESENT, ARE "PURCHASED POWER"**

{23} Having determined that the "rate-making process" includes both general

rate cases and automatic adjustment clauses, *see* Section 62–8–7, we must determine the proper method of cost recovery for EPE's REC costs. EPE sought automatic adjustment clause recovery of its REC costs, which the Commission approved. Section 62–8–7(E) of the PUA allows for automatic adjustment clause recovery of "taxes or cost of fuel, gas or purchased power." It is undisputed that EPE's REC costs do not constitute taxes or fuel or gas costs. However, the parties disagree as to whether EPE's REC costs constitute "purchased power." The Commission and EPE contend that they are; while NMIEC argues that they are not.

■■■■■ {24} With respect to questions of fact, we look to the whole record to determine whether substantial evidence supports the Commission's decision. *Att'y Gen. of N.M. v. N.M. Pub. Util. Comm'n (In re Comm'n's Investigation of the Rates for Gas Serv. of PNM's Gas Servs.)*, 2000–NMSC–008, ¶ 4, 128 N.M. 747, 998 P.2d 1198. In reviewing the whole record,

> the court must be satisfied that the evidence demonstrates the reasonableness of the decision. No part of the evidence may be exclusively relied upon if it would be unreasonable to do so. The reviewing court needs to find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency.

*Id.* (quoting *Nat'l Council on Comp. Ins. v. N.M. State Corp. Comm'n*, 107 N.M. 278, 282, 756 P.2d 558, 562 (1988)). We view the evidence in the light most favorable to the Commission's decision, *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 104 N.M. 565, 570, 725 P.2d 244, 249 (1986) (quoting *Att'y Gen. of N.M. v. N.M. Pub. Serv. Comm'n*, 101 N.M. 549, 553, 685 P.2d 957, 961 (1984)), and draw every inference in support of the Commission's decision, but we will not uphold the decision if it is not supported by substantial evidence. *Pub. Serv. Co. of N.M. v. N.M. Pub. Serv. Comm'n*, 92 N.M. 721, 722, 594 P.2d 1177, 1178 (1979). In

analyzing the nature of EPE's REC costs, we hold that substantial evidence does not support a conclusion that they constitute "purchased power."

{25} Commission Rule 572 defines a REC as "a document evidencing that the enumerated renewable energy kilowatt-hours have been generated from a renewable energy generating facility." 17.9.572.7(E) NMAC. Utilities are required to file RECs with the Commission to establish their compliance with the RPS of the REA. Section 62–16–5(A); 17.9.572.13 NMAC. However, utilities need not purchase the actual renewable energy represented by the REC. 17.9.572.13(B)(2) NMAC. Rather, as explained previously, the RECs can represent renewable energy the utility itself has generated; renewable energy the utility has purchased from another source; or renewable energy generated and contracted for delivery in New Mexico without the utility itself purchasing the energy.

{26} In the instant case, EPE purchased RECs representing a certain quantity of kilowatt-hours of renewable energy that had been generated by PNM and contracted for delivery in New Mexico. EPE did not, however, purchase the generated renewable energy represented by the RECs. In other words, EPE took credit for renewable energy generated by another source, in this case PNM, to fulfill its compliance requirements under the REA.[2] In addition to the fact that EPE did not purchase any actual power when it incurred the REC costs, the record is replete with admissions by the Commission and EPE that EPE's RECs, indeed, do *not* constitute "purchased power." The first set of admissions came at the Commission hearing. EPE witness Busser stated, "When you are purchasing a REC you are not purchasing power, correct, in our situation." Commission witness Gunter stated, "A REC is not purchased electric power, that's correct." With specific respect to EPEs RECs, Gunter stated, "EPE is not purchasing renewable electric power but the REC itself comes about in connection with that generation of renewable energy." Gunter also stated that

---

**2.** PNM cannot also take credit for that same renewable energy to fulfill its REA compliance requirements. *See* § 62–16–5(B)(1)(b)–(c).

EPE's RECs are "not electric power strictly speaking." Then, at oral argument, the Commission's counsel stated, in reference to EPE's RECs, "I don't think that the Commission can contend that it is literally purchased power."

{27} Beyond these admissions, allowing for automatic adjustment clause recovery of EPE's REC costs would directly contradict the stated purpose of automatic adjustment clauses set forth in the Commission's own Rule 550. The rule states that the purpose of an automatic adjustment clause "is to flow through to the users of electricity the increases or decreases in Applicable Fuel and Purchased Power costs per kilowatt-hour of *delivered* energy above or below a Base Cost." 17.9.550.6(D) NMAC (emphasis added). The Base Cost is "the cost of fuel and purchased power upon which the applicable rate schedule was based stated on a [dollar] per [kilowatt-hour] basis." 17.9.550.7(F) NMAC. Through an automatic adjustment clause, a public utility can increase or decrease the Base Cost on a dollar per kilowatt-hour basis, calculating that cost adjustment based on the required format and data calculations set forth in the Appendix to Rule 550. 17.9.550.7(C), (I) NMAC; 17.9.550.13 NMAC; 17.9.550.13 NMAC app. at 1–2 (Rule 550 Form I for Investor Owned Utilities and Generation and Transmission Cooperatives). We acknowledge that RECs are enumerated on a per kilowatt-hour basis and that the Commission requires that RECs contain some of the same data[3] used to calculate the purchased power automatic cost adjustment pursuant to Rule 550 Form I. In addition, we acknowledge that the RECs EPE purchased represent renewable energy that was *generated*, a fact upon which the Commission and EPE both focus. However, the fact of generation is not part of the statutory inquiry. Indeed, EPE did not purchase that renewable energy, and it was never *delivered* to EPE's customers. Therefore, we would create a legal fiction if we allowed EPE to recover its REC costs through its automatic adjustment clause because EPE would not

be "flow[ing] through to the users of electricity the increases or decreases in Applicable Fuel and Purchased Power costs per kilowatt-hour of *delivered* energy above or below a Base Cost." 17.9.550.6(D) NMAC (emphasis added).

{28} " 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *In re Comm'n's Investigation of the Rates for Gas Serv. of PNM's Gas Servs.*, 2000-NMSC–008, ¶ 11, (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The evidence of record does not support a conclusion that EPE's REC costs are "purchased power." Indeed, the record supports the opposite conclusion.

## 2. THE COMMISSION EXCEEDED ITS AUTHORITY BY CHARACTERIZING EPE'S REC COSTS AS "CLOSELY RELATED TO PURCHASED POWER" AND THUS RECOVERABLE THROUGH EPE'S AUTOMATIC ADJUSTMENT CLAUSE

{29} The Commission determined that EPE's REC costs were "so closely related to purchased power" so as to constitute "purchased power" and thus be automatically recoverable. Both the Commission and EPE rested on the argument that REC costs are "so closely related to" and "an integral part" of "purchased power" because (i) RECs represent renewable energy; (ii) RECs would not exist unless renewable energy were generated; and (iii) the Commission has "wide latitude" to determine what constitutes "purchased power" and what is appropriate for automatic adjustment clause recovery. At oral argument, Commission counsel stated the Commission's reasoning as follows: EPE's REC costs are "in fact closely enough related to literally energy or literally power that [they] w[ere] appropriately included in that clause." Having concluded that EPE's REC costs do not constitute "purchased pow-

---

3. The required information includes information regarding the facility that generated the renewable energy associated with the REC; the type of generator and fuel type; the location and capaci-ty of the generating facility; and the quantity in kilowatt-hours that the REC represents. 17.9.572.13(A) NMAC.

er," we review the Commission's decision that it has the authority and discretion to determine that EPE's REC costs are "closely related to purchased power" and thus recoverable through EPE's automatic adjustment clause.

{30} At the outset, we note this Court's long recognition of the broad authority of the Commission in setting utility rates. *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n (In re Ratemaking Methodology)*, 111 N.M. 622, 635, 808 P.2d 592, 605 (1991) ("The Commission is vested with broad discretion to pursue its statutory mandate to set just and reasonable rate or rates." (internal quotation marks and quoted authority omitted)); *Att'y Gen. of N.M. v. N.M. Pub. Serv. Comm'n.*, 101 N.M. at 553–54, 685 P.2d at 961–62 ("The Legislature has vested exclusive rate-making authority in the Commission. Furthermore, in a rate case, the Commission is vested with considerable discretion in determining the justness and reasonableness of utility rates. . . . Thus, the Commission is statutorily and constitutionally free to use any ratemaking formula it chooses." (quoted authority and internal citations omitted)). The Commission's broad rate-making authority "involves the making of pragmatic adjustments." *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 94 N.M. 731, 733–34, 616 P.2d 1116, 1118–19 (1980) (quoted authority omitted). Indeed, "the result reached, not the method employed" is what controls. *Id.* at 734, 616 P.2d at 1119; *see also N.M. Indus. Energy Consumers*, 104 N.M. at 569–70, 725 P.2d at 248–49 (noting that the Court has "consistently construed the [PUA] broadly rather than to limit the Commission to any one particular method; the touchstone is the reasonableness of the ultimate decision"). However, the instant case does not implicate the Commission's expertise and discretion in setting utility rates, as both the Commission and EPE paint the issue. Rather, our inquiry centers on the Commission's construction of the related provisions of the REA and the PUA, a matter not within the Commission's expertise and to which we accord little deference.

{31} The language of Section 62–8–7(E) is plain and unambiguous: only "taxes or cost of fuel, gas or purchased power" may be recovered automatically. In addition, the Commission's own Rule 550 and Rule 550 Form I for calculating the automatic cost adjustment factor specifically enumerate only these four costs for automatic recovery. The Legislature authorized automatic cost recovery for only limited types of costs in order to regulate the use of automatic adjustment clauses and to avoid the massive abuses of the past. Commission rate cases involving notice, hearing, and approval remain the general rule for cost recovery, while automatic adjustment clause recovery is a narrow exception.

{32} The Legislature never amended the PUA provisions regarding automatic adjustment clauses when it approved the REA, nor did it create any exceptions in the REA itself to the limitations on automatic adjustment clause recovery. Indeed, the Commission has not amended its own Rule 550 to make special provision for REA compliance costs. We acknowledge that the Commission has the authority to promulgate rules regarding "which costs should be included in an adjustment clause, procedures to avoid the inclusion of costs in an adjustment clause that should not be included and methods by which the propriety of costs that are included may be determined by the commission in a timely manner." Section 62–8–7(E)(3). However, this provision does not authorize the Commission to expand the list of costs eligible for automatic adjustment clause recovery. Otherwise, the limitation language of Section 62–8–7(E) would be rendered meaningless, and the abuses that the Legislature was concerned about could come to fruition. Rather, we read Section 62–8–7(E)(3) as granting the Commission the authority to promulgate rules that safeguard against abuses and thus fulfill the intent of the Legislature that automatic cost recovery be limited to the specifically enumerated costs set forth in Section 62–8–7(E). Likewise, the fact that the Commission has in the past allowed automatic recovery of gas hedging agreements and other costs not enumerated in Section 62–8–7(E) does not mean that we will sanction such a practice in the instant case.

{33} In light of its plainly exclusive language, we interpret Section 62–8–7(E) narrowly and decline to read into it "'language which is not there, particularly if it makes sense as written.'" *Pub. Serv. Co. of N.M.*, 1999–NMSC–040, ¶ 18 (quoting *Burroughs v. Bd. of County Comm'rs*, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975)). Based on the fact that EPE did not purchase the renewable energy associated with the RECs as well as the admissions of both the Commission and EPE that EPE's REC costs are not, in fact, "purchased power," we conclude that the Commission exceeded its authority by allowing EPE to recover its REC costs through its automatic adjustment clause by categorizing them as "closely related to purchased power." Consequently, the Commission's Order is unlawful. Because EPE did not purchase the renewable energy represented by the RECs, we do not pass on the propriety of automatic adjustment clause recovery for the costs of RECs which represent actual renewable energy purchased by the utility.

{34} In closing, we note that the Commission and EPE focused, in part, on the efficiency and cost-effectiveness of automatic adjustment clause recovery of EPE's REC costs, particularly in light of the mandatory nature of REA compliance. The Commission determined that automatic adjustment clause recovery would be the most efficient and cost-effective method for recovering EPE's REC costs, both for EPE and for consumers. While cost-effectiveness and efficiency are important goals, they are not the standard for automatic adjustment clause recovery which the Legislature has set forth in the PUA. In the final analysis, EPE may recover the reasonable costs of complying with the REA through a general rate case. Nevertheless, this case highlights the need for the Legislature to harmonize the antecedent PUA with the related provisions of the REA. However, until the Legislature does so, we will continue to read the PUA as written and allow for automatic recovery only of the costs specifically enumerated in Section 62–8–7(E), "taxes or cost of fuel, gas or purchased power."

## V. CONCLUSION

{35} The REA allows utilities to recover reasonable compliance costs though the "rate-making process." Section 62–16–6(A). We read this provision together with Section 62–8–7(E) of the PUA and hold that the "rate-making process" refers to both general rate cases and automatic adjustment clauses, depending on the type of cost involved. Automatic adjustment clauses may be used to recover only "taxes or cost of fuel, gas or purchased power." Section 62–8–7(E). Substantial evidence does not support the conclusion that EPE's REC costs are "purchased power." Moreover, the Commission exceeded its authority in declaring these costs "closely related to purchased power" and thus recoverable through EPE's automatic adjustment clause. Consequently, the Commission's Order is unlawful and is hereby vacated. We remand to the Commission for proceedings in accordance with this Opinion.

{36} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PETRA JIMENEZ MAES, RICHARD C. BOSSON, Justices, PAMELA B. MINZNER, Justice (not participating).