IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-024

Filing Date: March 5, 2018

Docket No. S-1-SC-35697

NEW ENERGY ECONOMY, INC.,

     Appellant,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION,

     Appellee,

and

PUBLIC SERVICE COMPANY OF NEW MEXICO,
NEW MEXICO INDUSTRIAL ENERGY CONSUMERS, and
WESTERN RESOURCE ADVOCATES,

     Intervenors-Appellees.

In the Matter of the Application of
Public Service Company of New Mexico for
Approval to Abandon San Juan Generating
Station Units 2 and 3, Issuance of Certificates
of Public Convenience and Necessity for
Replacement Power Resources, Issuance of
Accounting Orders and Determination of
Related Rate-Making Principles and Treatment,
NMPRC Case No. 13-00390-UT

APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION

New Energy Economy
Mariel Nanasi
Santa Fe, NM

Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
John Warwick Boyd

1

Albuquerque, NM

for Appellant

Michael C. Smith
Santa Fe, NM

for Appellee

PNM Resources, Inc.
Patrick V. Apodaca
Benjamin John Phillips
Stacey J. Goodwin
Albuquerque, NM

Cuddy & McCarthy, LLP
Patrick T. Ortiz
Santa Fe, NM

Keleher & McLeod, P.A.
Thomas C. Bird
Albuquerque, NM

Miller Stratvert, P.A.
Richard L. Alvidrez
Albuquerque, NM

for Intervenor Public Service Company of New Mexico

Peter Jude Gould
Santa Fe, NM

for Intervenor New Mexico Industrial Energy Consumers

Western Resource Advocates
Steven S. Michel
Santa Fe, NM

for Intervenor Western Resource Advocates

Paul F. Hultin
Santa Fe, NM

Heard Robins Cloud LLP

Justin Ross Kaufman
Rosalind Bell Bienvenu
Santa Fe, NM

for Amicus Curiae 350 New Mexico

**OPINION**

**NAKAMURA, Chief Justice.**

**{1}**    New Energy Economy, Inc. (NEE) appeals from a final order issued by the New Mexico Public Regulation Commission (PRC).  NEE contends that the PRC violated New Mexico law by approving a contested stipulation granting the Public Service Company of New Mexico (PNM) certificates of public convenience and necessity (CCNs) to acquire new generation resources and by filing a notice proposing to dismiss the protests to PNM's 2014 integrated resource plan (IRP).  NEE's arguments are predicated on a mistaken understanding of the law and ask us to accept factual assertions that were rejected below.  We affirm the PRC's final order.

**I.    BACKGROUND**

**{2}**    The record in this case is comprised of seventy-six volumes that contain nearly 50,000 pages.  It is, as PNM points out, "massive."  Any attempt at a comprehensive account of the background of this direct appeal would be unproductive.  A brief overview of the facts and procedure follows immediately below.  Supplemental facts are provided as necessary in the course of our discussion.

**{3}**    The federal Clean Air Act (the Act) includes provisions designed to preserve visibility standards by imposing limitations on haze-causing emissions. 42 U.S.C. §§ 7410, 7491-92 (2012); *see generally Arizona ex rel. Darwin v. U.S. E.P.A.*, 815 F.3d 519, 524-28 (9th Cir. 2016) (summarizing the legislative and regulatory framework underlying the federal government's efforts to address regional haze).  The Act and the regulations adopted by the Environmental Protection Agency (EPA) to enforce it require states to develop state implementation plans to control and minimize sources of haze-causing emissions.  *See generally Arizona*, 815 F.3d at 524-27 (discussing the responsibilities placed upon the states by the Act).  If a state fails to submit a state implementation plan or submits a plan that is inadequate, the Act permits the EPA to impose a federal implementation plan. 42 U.S.C. § 7410(c)(1); *see generally Arizona*, 815 F.3d at 524-27.

**{4}**    PNM is a part-owner of the San Juan Regional Generation Station (San Juan), a four-unit, coal-fired power plant near Farmington, New Mexico that is a source of emissions that cause or contribute to haze.  The EPA rejected New Mexico's state implementation plan to control and minimize haze-causing emissions at San Juan and proposed a federal implementation plan that would require PNM to install "extremely costly" emission controls

3

on all four of the San Juan units.

{5}     Various stakeholders, including several New Mexico state agencies, the Governor of New Mexico, tribal leadership, and PNM, engaged in discussions and held open public meetings to identify an alternative to the federal implementation plan that would ensure New Mexico's compliance with the federal haze standards. Ultimately, an agreement was reached and a revised state implementation plan was submitted to the EPA proposing the following course of action: PNM would retire San Juan Units Two and Three, install less-costly pollution controls on San Juan Units One and Four, and replace the lost generation capacity from the retirement of San Juan Units Two and Three with generation from other resources that minimize impacts on visibility.  The EPA accepted the revised state implementation plan. *Approval and Promulgation of Implementation Plans New Mexico*, 79 Fed. Reg. 26909, 26909-21 (May 12, 2014).  In the wake of the EPA's acceptance, the focus of the various stakeholders turned to what resources PNM would utilize to replace the generation capacity lost as a consequence of the retirement of the two units.  This question was extensively litigated before the PRC as PNM is required to obtain PRC approval to abandon, acquire, or construct generation resources.  NMSA 1978, § 62-6-12(A)(4) (1989); NMSA 1978, § 62-9-1(A) (2005); NMSA 1978, § 62-9-5 (2005). These statutes governing the PRC's oversight of generation resources are examined more closely in our discussion.

{6}     In December 2013, PNM filed an application with the PRC to retire San Juan Units Two and Three and for CCNs to utilize two sources to replace the generation capacity lost from the retirement of the two units:  Palo Verde Nuclear Generating Station (Palo Verde) Unit Three and additional generation capacity from San Juan Unit Four.[1]  The PRC appointed a hearing examiner (HE) to address the merits of PNM's applications.  *See* 1.2.2.29(B) NMAC ("In all proceedings, the [PRC] may designate a hearing examiner . . . to preside over the proceeding."); 17.1.2.9(C) NMAC ("The [PRC], upon receipt of an application for a certificate of public convenience and necessity, shall fix a time for a public hearing.").  NEE and sixteen other parties, including several New Mexico governmental agencies, environmental advocates, and industrial and consumer advocates, joined the proceedings as intervenors.

{7}     In October 2014, after discovery had been provided and numerous witnesses and subject-matter experts testified at multiple hearings, PNM, along with several parties, submitted a stipulation that proposed a resolution to the proceedings.  NEE and several other parties contested the stipulation.  Additional hearings were conducted and the HE issued a thorough and detailed recommendation advising the PRC to reject the stipulation.

{8}     The HE concluded that the stipulation was fatally flawed because PNM had not

---

[1]PNM indicated that it could also utilize solar and gas resources and filed separate independent applications with the PRC to construct a solar photovoltaic facility and a gas peaking plant to make up for the capacity lost due to the retirement of the units at San Juan.

shown that San Juan Unit Four was a reliable replacement generation resource. Nevertheless, the HE concluded that PNM should receive a CCN to obtain replacement generation from Palo Verde Unit Three and determined that the stipulation as a whole should be approved if PNM and the other stipulating parties demonstrated that San Juan Unit Four could be relied upon as a replacement generation resource. PNM and the other stipulating parties acted on the HE's guidance and submitted a supplemental stipulation in August 2015 that addressed the HE's concerns. NEE contested the supplemental stipulation, but this time was joined by only one other party.

**{9}** Hearings were again conducted and the HE issued another thorough and detailed recommendation in which all of NEE's objections to the supplemental stipulation were addressed. The HE was satisfied that PNM had demonstrated that it had adequate replacement resources and had resolved the issues that had previously concerned the HE with respect to San Juan Unit Four. The HE recommended that the PRC accept the supplemental stipulation with minor modifications that are not relevant here. The HE also recommended that the PRC accept a provision within the supplemental stipulation stating that "protests of PNM's 2014 IRP should be closed without further [PRC] action in that docket."

**{10}** The PRC issued a final order on December 16, 2015 accepting the HE's recommendations. NEE appeals the PRC's final order. We have jurisdiction over the appeal under NMSA 1978, Section 62-11-1 (1993) ("Any party to any proceeding before the commission may file a notice of appeal in the supreme court asking for a review of the commission's final orders.").

## II.    DISCUSSION

**{11}** NEE argues that "[t]he PRC's order violates NM statutes and PRC regulations" because "[t]he PRC accepted PNM's limited alternatives in violation of the law." In support of its position, NEE makes many arguments that this Court finds are unpersuasive or entirely without merit. We begin our discussion by examining the applicable statutory and regulatory standards implicated by NEE's arguments. We then review the administrative record and describe how these standards were applied in this case. Next, we identify the standard of review that governs our review of NEE's arguments and clarify what we meant when we explained in the collateral mandamus proceeding NEE initiated that we would review this appeal with "heightened scrutiny." Finally, we turn to NEE's specific arguments.

### A.    Statutory and Regulatory Standards

### 1.    IRPs

**{12}** The Efficient Use of Energy Act, NMSA 1978, §§ 62-17-1 to -11 (2005, as amended through 2013), requires "public utilities supplying electric or natural gas service to

5

customers [to] periodically file an [IRP] with the [PRC]." Section 62-17-10; *see also* § 62-17-2(I) ("[P]ublic utility resource planning to meet New Mexico's energy service needs should be identified and evaluated on an ongoing basis in accordance with the principles of integrated resource planning."). These IRPs

> shall evaluate renewable energy, energy efficiency, load management, distributed generation and conventional supply-side resources on a consistent and comparable basis and take into consideration risk and uncertainty of fuel supply, price volatility and costs of anticipated environmental regulations in order to identify the most cost-effective portfolio of resources to supply the energy needs of customers.

Section 62-17-10. "The preparation of resource plans shall incorporate a public advisory process." *Id.* The PRC has promulgated regulations to effectuate the IRP provisions. 17.7.3 NMAC (04/16/2007, as amended through 08/29/2017).

**{13}** Under 17.7.3.9 NMAC, utilities must file an IRP with the commission every three years. Each IRP is to employ a twenty-year planning horizon. 17.7.3.7(K) NMAC. An IRP should seek to identify "resource options" and determine "the most cost effective resource portfolio and alternative portfolios[.]" 17.7.3.9(B)(4),(7) NMAC. Additionally, 17.7.3.9(G)(1) NMAC provides as follows:

> To identify the most cost-effective resource portfolio, utilities shall evaluate all feasible supply, energy storage, and demand-side resource options on a consistent and comparable basis, and take into consideration risk and uncertainty (including but not limited to financial, competitive, reliability, operational, fuel supply, price volatility and anticipated environmental regulation). The utility shall evaluate the cost of each resource through its projected life with a life-cycle or similar analysis. The utility shall also consider and describe ways to mitigate ratepayer risk.

Other statutes govern the circumstances under which a utility may procure, construct, or abandon generation resources.

## 2. CCNs

**{14}** Utilities must obtain PRC approval whenever they seek to acquire an existing generation resource or abandon a generation resource. Section 62-6-12(A)(4) ("With the prior express authorization of the commission, but not otherwise . . . any public utility may sell, lease, rent, purchase or acquire any public utility plant or property constituting an operating unit or system or any substantial part thereof[.]"); Section 62-9-5 ("No utility shall abandon all or any portion of its facilities . . . without first obtaining the permission and approval of the commission. The commission shall grant such permission and approval, after notice and hearing, upon finding that the continuation of service is unwarranted or that

the present and future public convenience and necessity do not otherwise require the continuation of the service or use of the facility[.]”). Utilities must obtain a CCN from the PRC to construct or operate any new generation resource. Section 62-9-1(A) (“No public utility shall begin the construction or operation of any public utility plant or system . . . without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction or operation.”). The PRC has interpreted “public convenience and necessity” to entail a net public benefit. *In re Valle Vista Water Util. Co.*, 212 P.U.R. 4th 305, 309 (2001).

**{15}** Throughout its briefing, NEE cites to the statutes and administrative regulations governing the IRP process as support for its arguments that the HE and PRC committed error in the stipulation and supplemental stipulation proceedings, which were initiated to resolve PNM's CCN applications. NEE provided no explanation why it was citing the IRP regulations in its challenge to the conclusions reached in the CCN proceedings. It was only after we reviewed the administrative records in the proceedings arising from PNM's 2011 and 2014 IRPs that we understood why NEE points to the IRP standards as grounds to object to the CCN determination. NEE did not direct us to these records and, yet, they are essential to understanding NEE's arguments and the proceedings below. The agreements PNM and the stipulating parties reached in the CCN proceedings to ensure compliance with the revised state implementation plan proposed to resolve the 2014 IRP protests. We now review those records and the administrative proceedings.

**B.    The Administrative Record**

**{16}** PNM filed its 2011 IRP with the PRC in July 2011. NEE and several of the intervenors in the present appeal filed protests, and in August 2011 the PRC set hearings on those protests. At a prehearing conference, PNM and several other parties made a request for mediation, which was granted. Mediation was scheduled for June 2012; however, at the end of May 2012, PNM and several of the protestors filed an unopposed motion to vacate the mediation. The motion explained that “continuation of the mediation process at this time would not be productive.” The movants asked NEE its position on the motion and NEE did not oppose it.

**{17}** In September 2013, PNM filed a notice of material change with the PRC. *See* 17.7.3.10 NMAC (“The utility shall promptly notify the commission and participants of material events that would have the effect of changing the results of the utility's IRP had those events been recognized when the IRP was developed.”). PNM stated that the EPA's acceptance of the revised state implementation plan constituted “a material change in circumstance that has the effect of changing certain results of the 2011 IRP.” PNM further stated that the material change prompted it to “accelerate[] aspects of the development of its 2014 IRP” and to seek approval of a “regulatory plan to comply with the [revised state implementation plan], including any needed revisions to the four-year action plan in the 2011 IRP.” Two days after PNM filed this notice of material change, the PRC (upon its own motion) filed a notice proposing to dismiss the 2011 IRP protest proceedings for lack of

7

activity. The parties protesting the 2011 IRP were permitted an opportunity to file a motion explaining why the 2011 IRP protest docket should remain open, but no such motion was filed and the 2011 IRP hearings were closed.

**{18}** The CCN proceedings from which NEE pursued this present appeal began in December 2013 when PNM filed its application for the CCNs required to comply with the revised state implementation plan. PNM submitted its 2014 IRP to the PRC in July 2014, while the CCN proceedings were ongoing. NEE and several of the intervenors in this present appeal filed protests to PNM's 2014 IRP. NEE's protest acknowledged the overlap between the issues in the CCN proceedings and the 2014 IRP protest proceedings and contended that the public's interest in efficient adjudication would be best served by addressing the 2014 IRP matters after the CCN case was resolved. The PRC agreed and concluded that the 2014 IRP protest hearings would be held in abeyance until the CCN proceedings were finalized.

**{19}** At the conclusion of the CCN proceedings, the HE determined that the replacement generation resource portfolio identified in the supplemental stipulation provided a net public benefit—the applicable standard PNM had to satisfy to receive a CCN. The modified stipulation

(1) allows PNM and the state of New Mexico to comply with federal law by retiring San Juan Units Two and Three;

(2) eliminates a significant amount of coal-fired generation at San Juan—half the power plant's capacity—thereby cutting greenhouse gas emissions, dust emissions, and water use in half;

(3) saves PNM customers approximately $340 million by incorporating new ownership and coal supply agreements;

(4) yields additional savings for ratepayers of up to $38 million due to an agreed reduction in the rate-base value of Palo Verde Unit Three;

(5) utilizes existing resources to maintain the reliability of PNM's system;

(6) commits PNM to incorporating more renewable energy production in its energy supply and requires PNM (starting in 2020) to acquire solar or wind credits or allowances, which will help satisfy requirements of both the federal Clean Power Plan and New Mexico Renewable Energy Act, NMSA 1978, Section 62-16-1 to -10 (2004, as amended through 2014);

(7) requires PNM to issue and evaluate a request for proposals for all energy sources identified in the 2017 IRP using a hypothetical assumption that San Juan will no longer operate after 2022;

(8) provides for a 2018 PRC review of the future of San Juan in New Mexico's energy supply that will allow for the resolution of uncertainties regarding longer-term coal costs, environmental regulations, and San Juan ownership interests beyond the expiration of the current ownership commitments in 2022;

(9) requires PNM to obtain firm pricing and other terms before extending its existing coal-supply agreement beyond 2022;

8

(10)    minimizes the impact closing San Juan will have on San Juan County and northwest New Mexico, which depend on San Juan as a source of employment by "provid[ing] an additional 4 1/2 years beyond the 2017 [partial] closure for the region and PNM customers to economically prepare and adjust" in the event that PNM shuts down, or partially shuts down, the remaining San Juan units; and

(11)    requires PNM to contribute $250,000 at shareholder expense rather than ratepayer expense to a Good Neighbor Fund that assists low-income customers with their utility bills.

**{20}**    The HE also recommended that the PRC approve the provision in the supplemental stipulation recommending dismissal of the 2014 IRP protest proceedings and stated "that there will likely be no valid purpose to proceed with the 2014 IRP proceeding." This determination is supported by several findings: (1) "[e]ach of [PNM's] 20-year analyses showed that the replacement [generation] power portfolio that includes the 134 MW of Palo Verde Unit 3 and the additional 132 MW of San Juan Unit 4 is the most cost effective portfolio of the alternatives analyzed"; (2) "the review conducted for the CCNs requested in this proceeding has been equivalent to an IRP review"; (3) the CCNs at issue in PNM's application "resolve PNM's new resource needs for the four year period of the action plan in the 2014 IRP"; and (4) the supplemental stipulation requires PNM to commit to certain future resource planning obligations. These future obligations will require PNM to file "with the [PRC, after July 1, 2018 but no later than December 31, 2018,] to determine the extent to which the San Juan station should continue serving PNM's retail customers' needs after June 30, 2022[,]" and will require PNM to conduct a request for proposals as soon as practicable after the filing of its 2017 IRP to identify the most cost-effective resource portfolio using the assumption that San Juan *will not* continue to operate beyond 2022. These future obligations are imposed upon PNM not because the stipulating parties wished to delay review, but because crucial information regarding the future of coal supply for San Juan would likely be resolved by 2018 and this, in turn, would permit the multiple owners of San Juan to have a far clearer sense about whether they each, individually, wish to continue operation of San Juan.

**{21}**    Despite the abundance of evidence supporting closure of PNM's 2014 IRP, the HE emphasized that "the [PRC] cannot properly act in this [CCN] docket to close a separate docket" and instead recommended "that the [PRC], based upon the approvals it will have granted here, issue a Notice of Proposed Dismissal in the 2014 IRP docket, as it did in the 2011 IRP case." The PRC accepted this recommendation and a notice of proposed dismissal was filed in the 2014 IRP docket. NEE filed a request to hold the 2014 IRP proceedings in abeyance or dismiss them without prejudice, but the PRC has not filed an order granting or denying this request. The last filing in the 2014 IRP docket was a notice of material event filed by PNM in July 2016.

**C.    Standard of Review**

**{22}**    This appeal arises from a final order approving a contested supplemental stipulation.

9

The New Mexico Administrative Code identifies the procedures the PRC must follow when adjudicating a contested stipulation. 1.2.2.20(B) NMAC. Our case law provides the substantive legal standards that must be met to permit the PRC to approve a contested stipulation. Our case law instructs that the PRC

> can adopt a contested stipulation by, first, affording any non-stipulating party an opportunity to be heard on the merits of the stipulation . . . and second, making an independent finding, supported by substantial evidence in the record, that the stipulation does indeed resolve the matters in dispute in a way that is fair, just and reasonable and in the public interest.

*Attorney Gen. v. N.M. Pub. Serv. Comm'n*, 1991-NMSC-028, ¶ 15, 111 N.M. 636, 808 P.2d 606. The hearings below were conducted in conformity with the governing regulation and the HE correctly identified the substantive legal standards necessary to resolve the merits of the contest and determined that both prongs of the two-part test were met. The PRC accepted the HE's determination.

**{23}** NEE does not argue that it was denied an opportunity to be heard on the merits of the contested supplemental stipulation, and this is for good reason. All interested stakeholders were given more than adequate opportunity to participate in the extensive administrative proceedings below. NEE's arguments are directed solely at the factual basis upon which the HE's and PRC's decisions rest and the lawfulness of the PRC's decision to accept the HE recommendation to approve the contested supplemental stipulation. The standards we apply to these types of arguments are well-settled.

**{24}** Generally speaking, we review the PRC's determinations to decide whether they are "arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law, with the burden on the appellant to make this showing[.]" *N.M. Indus. Energy Consumers v. N.M. Pub. Regulation Comm'n (NMIEC)*, 2007-NMSC-053, ¶ 13, 142 N.M. 533, 168 P.3d 105 (internal quotation marks and citation omitted); *see* NMSA 1978, § 62-11-4 (1965). This general rule is subject to further refinement.

**{25}** We must assess whether the PRC's decision presents a question of fact, a question of law, or some combination of the two. *Albuquerque Bernalillo Cty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n (ABCWUA)*, 2010-NMSC-013, ¶ 17, 148 N.M. 21, 229 P.3d 494. "With respect to questions of fact, we look to the whole record to determine whether substantial evidence supports the Commission's decision." *NMIEC*, 2007-NMSC-053, ¶ 24. "We view the evidence in the light most favorable to the [PRC's] decision and draw every inference in support of the [PRC's] decision[.]" *Id.* (citation omitted). When fact finding is necessarily predicated on matters requiring expertise, our deference is substantial. *See ABCWUA*, 2010-NMSC-013, ¶ 50 ("The PRC's decisions requiring expertise in highly technical areas, such as utility rate determinations, are accorded considerable deference." (internal quotation marks and citation omitted)). As to matters of law, if it is clear that our

10

Legislature delegated to the PRC (either explicitly or implicitly) the task of giving meaning to interpretive gaps in a statute, we will defer to the PRC's construction of the statute as the PRC has been delegated policy-making authority and possesses the expertise necessary to make sound policy. *See generally* I Richard J. Pierce, Jr., *Administrative Law Treatise* §§ 3.2-3.3, at 159-61 (5th ed. 2010) (describing the nature of judicial review of agency policy decisions); *accord City of Albuquerque v. N.M. Pub. Regulation Comm'n*, 2003-NMSC-028, ¶ 16, 134 N.M. 472, 79 P.3d 297 ("[I]t is presumed, in the context of administrative matters that the Legislature has delegated to an agency, that the Legislature intended for the agency to interpret legislative language, in a reasonable manner consistent with legislative intent, in order to develop the necessary policy to respond to unaddressed or unforeseen issues."). "However, we are not bound by the [PRC's] interpretation and we may substitute our own independent judgment for that of the [PRC] if the [PRC's] interpretation . . . is unreasonable or unlawful." *ABCWUA*, 2010-NMSC-013, ¶ 51 (omission in original) (internal quotation marks and citation omitted).

**{26}** NEE's arguments require us to overlay these well-settled standards to the PRC's determination to accept the contested stipulation. In practical terms and as will be made evident in the course of our discussion of NEE's specific arguments, this means we must determine whether the findings that prompted the PRC to accept the contested stipulation are supported by substantial evidence and whether the PRC's decision to accept the contested stipulation as a reasonable and just resolution of the CCN proceedings was a lawful and permissible exercise of its discretion. One final preliminary matter requires our attention before turning to NEE's arguments: our statement that we would review this case with "heightened scrutiny."

**{27}** During the course of the administrative proceedings, NEE filed a petition for a writ of mandamus asking this Court to order several of the PRC Commissioners to recuse themselves from participation in the CCN proceedings on grounds that the commissioners allegedly engaged in inappropriate ex parte communications with PNM and were purportedly biased in favor of PNM. We rejected NEE's petition, did not accept its contention that the commissioners were biased, but nevertheless indicated that we would review the record in the stipulation proceedings, when and if an appeal was taken, with "heightened scrutiny." We have done just that.

**{28}** NEE's arguments and the factual predicates upon which those arguments are based have been carefully scrutinized. NEE is entitled to nothing more. NEE is mistaken when it suggests that our decision to apply "heightened scrutiny" shifted the burden in this appeal to PNM and the PRC to demonstrate the validity of the administrative action. This is not the case. Similarly, NEE's assertion that we will not, in this case, "accord the deference traditionally accorded" to the PRC is also incorrect.

**D.     NEE's Arguments**

**1.     PRC Oversight**

11

**{29}**     NEE contends that "[t]he final order that approved the modified stipulation was arbitrary and capricious because it removed PRC oversight or postponed it."   More specifically, NEE protests that the PRC impermissibly "treated the CCN hearing as a replacement for the required IRP stakeholder engagement and resource evaluation process." NEE objects that this amounts to little more than "an end run around the law."  These claims do not withstand scrutiny.

**{30}**     The IRP provisions require PNM to demonstrate the merits of its 2014 IRP as measured by the standards articulated in Section 62-17-10 and clarified in the applicable provisions of the administrative code and require the PRC to permit public participation in its review of PNM's 2014 IRP.  Section 62-17-10; 17.7.3.9(H) NMAC.  In the CCN proceedings, the HE expressly determined that the replacement generation resource portfolio identified in the supplemental stipulation satisfied the statutory and regulatory IRP standards and the process by which this determination was made incorporated ample public participation.  The PRC did not violate or shirk its statutorily-imposed responsibilities by proposing, in the CCN proceedings, to dismiss the protests to PNM's 2014 IRP.  All parties recognized that the issues addressed in the CCN proceedings were the very same issues at the heart of the 2014 IRP protest proceedings.  NEE gives us no reason to conclude that the PRC was required to hold duplicative proceedings.  The final order did not "remove" or "postpone" the PRC's review of PNM's 2014 IRP.

**2.     Strategist**

**{31}**     NEE argues that the HE erred in determining that the replacement generation resource portfolio identified in the supplemental stipulation was the most cost effective because the HE relied on data from PNM that was in turn produced by PNM's alleged manipulation of Strategist, the software suite PNM used to determine the most cost-effective replacement generation resource portfolio.  NEE insists that "[i]t is impossible to examine PNM's submissions and find any explanation or quantification of the relative costs of feasible resources, as the law requires."  These claims are inconsistent with the record.

The HE found that

PNM's Strategist analyses in the January and October hearings assessed the costs to operate and maintain a large number of potential resource portfolios to replace San Juan Units 2 and 3. [PNM's expert witness] Mr. O'Connell stated that the Strategist modeling considered solar, wind, natural gas, coal and nuclear generation alternatives and assumed the continued growth of PNM's energy efficiency and distributed generation programs.  He said the Strategist modeling evaluated thousands of potential combinations of these resources.

PNM's Strategist runs also evaluated replacement power portfolios for a three- and four-unit shutdown.  The evaluation of the three-unit

12

shutdown was performed in response to a bench [memorandum] request issued during the January hearings.

The HE specifically listed each of the varying types of resources PNM considered in its modeling. The HE's findings were supported by the testimony of Patrick J. O'Connell, PNM's director of planning and resources. The HE had the discretion to accept or reject Mr. O'Connell's testimony and his determination that the replacement generation resource portfolio was the most cost effective was supported by substantial evidence in the record.

{32}   NEE also argues that PNM utilized Strategist to evade the requirement that it consider the cost of resources on a "consistent and comparable" basis. NEE contends that PNM used differing values for Palo Verde Unit Three in different Strategist evaluations and that the HE erred by accepting these evaluations. We reject this claim. The HE accepted PNM's use of different values for different Strategist runs because he concluded that "it was reasonable to consider cost savings realized under the stipulations solely for the stipulation portfolio." The HE's determination that PNM's Strategist modeling correctly included the cost savings is a determination requiring expertise and technical competency we are in no position to second-guess.

## 3.   Consideration of Renewable Resources

{33}   NEE argues that "PNM failed to consider or reasonably assess resources such as wind, solar and gas, which are less costly and less risky than coal or nuclear[,]" and contends that solar and wind are less expensive resources than either the nuclear power produced by Palo Verde or the coal power produced by San Juan. As the discussion in the previous section shows, PNM did consider renewable resources when attempting to determine the most cost-effective replacement generation resources. The evidence presented persuaded the HE that utilizing Palo Verde Unit Three and obtaining additional power from San Juan Unit Four was the most cost-effective choice. We will not second-guess this determination.

## 4.   Resource Costs

{34}   NEE argues that "solar and wind generation facilities produce energy at a lower cost than coal-fired and nuclear power plants[.]" NEE then discusses what costs should have been assigned to varying resources at a "levelized cost" to establish that "wind, solar and gas . . . are less costly . . . than coal or nuclear." PNM responds that levelized cost analyses are inappropriate "when comparing technologies with different production profiles, such as dispatchable generation to variable or intermittent generation." The question of what cost the HE should or should not have assigned to any given resource is a paradigmatic fact inquiry that requires technical expertise to comprehend and resolve. NEE's arguments give us no reason to second-guess the HE's cost assessment for any given resource.

## 5.   Van Winkle

**{35}**     NEE argues that the "only cogent, accurate and understandable assessment of relative generation resource costs on a consistent and comparable basis in the record was provided by NEE's David Van Winkle."  This argument ignores the fact that the HE expressly determined that Van Winkle's opinion is "not convincing" and that his analysis "over-simplif[ied] the resource selection process and exclude[d] significant costs."  The HE went further and expressly noted that, while

> NEE witness, Mr. Van Winkle has educational and work experience in electrical engineering and an impressive familiarity with PNM's finances and generation resources[, h]e does not have professional experience in the electric power industry planning . . . such that the depth of his experience is not sufficient to accept his opinions on the design of a system over the opinions of witnesses with such experience.

The HE also pointed out that "on cross-examination, [Mr. Van Winkle] agreed that his alternatives might not be feasible."  The PRC was not bound by Van Winkle's opinion and its decision was otherwise supported by substantial evidence in the record .  *See Attorney Gen. v. N.M. Pub. Serv. Comm 'n*, 1984-NMSC-081, ¶ 15, 101 N.M. 549, 685 P.2d 957 ("The [PRC] is not bound by the opinions of experts so long as the Commission's ultimate decision is supported by substantial evidence.").

## 6.     Burden Shifting

**{36}**     NEE argues that "the PRC unlawfully shifted the burden of proof."  NEE clarifies that the HE "effectively excused PNM's failure to carry its burden of proof regarding cost and feasibility by concluding (incorrectly) that *NEE witness* Van Winkle failed to prove the existence of other feasible [alternatives]."  According to NEE, PNM wrongly declined to evaluate Van Winkle's proposed alternatives using Strategist and, in failing to do so, PNM never meaningfully considered the costs of certain alternative energy resources that NEE supported as replacement portfolio candidates.  According to NEE, the HE "effectively turned the regulatory process case on its head, making PNM the regulator, by allowing PNM to decide what alternatives it is going to present to the [PRC] and allow it to consider, while dismissing any effort by an intervenor to suggest that other alternatives should be considered."  We do not accept this line of reasoning.

**{37}**     PNM was not required to assist the witnesses of its adversary.  The HE rejected Van Winkle's opinion and he was free to do so.  *See Attorney  Gen.*, 1984-NMSC-081, ¶ 15.  PNM also proved that there were significant benefits that flowed from the supplemental stipulation and the replacement generation resources identified there.  Those many benefits are summarized above and need not be restated.  The HE determined that these many benefits established that the CCNs requested by PNM provided a net public benefit.  The HE did not turn the regulatory framework on its head.

## 7.     Request for Proposals (RFP)

**{38}** NEE objects that PNM "unilaterally decided to not investigate the market through an appropriate competitive [RFP] process to identify . . . alternatives [to San Juan Unit Four and Palo Verde Unit Three]." NEE contends that an RFP "is the normal, well-established and Commission-accepted method for utilities to show that their resource proposals are the most cost-effective options available to satisfy a demonstrated service need." NEE further claims that the PRC's decision to not require PNM to conduct an RFP necessarily means that the PRC "lacked reliable and 'substantial evidence' to reasonably conclude PNM['s] proposals were the most cost effective options currently available to satisfy PNM's service needs" and that the PRC "failed to exercise its authority . . . to reasonably protect the public interest." The evidence presented and accepted by the HE and PRC undermines these arguments.

**{39}** The HE rejected the argument that PNM was required to conduct an RFP and the PRC accepted this determination. The PRC pointed out that NEE had not "cited any law that requires or authorizes the [PRC] to order a utility to issue an RFP." Both the PRC and the HE also determined, based on the testimony presented in the stipulation and supplemental stipulation proceedings, that requiring PNM to conduct an RFP would have been counterproductive and could have steered the parties away from the "most preferable solution." The HE expressly questioned and had doubts about the testimony of Ronald Lehr, NEE's witness and "[t]he primary witness urging the [PRC] to require the use of RFPs."

**{40}** Lehr, the HE pointed out, had very little knowledge about the details of the resources proposed in the supplemental stipulation, New Mexico law, or the resource needs of PNM's system. The PRC, in turn, emphasized the testimony of New Mexico Attorney General witness Andrea Crane. Crane testified that it would have been impractical to order PNM to undertake an RFP and NEE's suggestion to the contrary greatly oversimplified the complexity of what PNM and the other parties joining in the stipulation and modified stipulation were trying to achieve. This evidence reflects that the HE and PRC determined that an RFP was neither required nor appropriate. We will not second-guess this determination.

## 8. Ratepayer Risks

**{41}** NEE contends that "the PRC did not require PNM to adequately assess and mitigate ratepayer risks[.]" NEE submits that "significant unknowns and unquantified risks that include financial, reliability, operational, and anticipated environmental regulations exist with both San Juan coal and Palo Verde nuclear and were virtually ignored, contrary to NM statute and PRC regulation." These arguments are inconsistent with the record and insist that the PRC embrace policy choices the PRC was free to reject.

**{42}** The HE explicitly noted the varying mechanisms in the supplemental stipulation that ameliorated the risks associated with nuclear power generation and utilization of Palo Verde Unit Three specifically. It is necessary to reference only a few of those mechanisms. The supplemental stipulation requires PNM to contribute $11 million to the decommissioning

15

trust for Palo Verde Unit Three and addresses how costs will be shared between ratepayers and investors in the event decommissioning costs exceed a certain threshold. It "prohibits PNM from recovering the costs associated with the storage and disposal of spent fuel from the operation prior to January 1, 2018." It also requires PNM to pass along to ratepayers certain refunds PNM receives from the United States Department of Energy. NEE's contention that PNM should not be permitted to derive additional capacity from San Juan Unit Four because there is simply too much risk associated with coal power generation ignores the fact that the reason PNM applied for a CCN for additional power from San Juan Unit Four was to close San Juan Units Two and Three and eliminate the risks and adverse impacts associated with continued use of all four San Juan units.

**{43}** The HE was free to perform his own calculation of the costs and benefits of the supplemental stipulation and did so. The PRC's decision to accept the HE's cost benefit analysis is a quintessential policy determination with which we will not interfere. *See Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 16, 140 N.M. 6, 139 P.3d 166 ("[T]he PRC has been granted policy-making authority in several areas.").

## 9.    David Rode

**{44}** NEE contends that the PRC erred when it rejected the testimony of David Rode, a witness called by the PRC staff to testify as to "the risk and portfolio selection analyses prepared by PNM." NEE asserts that "[n]one of [Rode's] challenges to PNM's limited evaluation process and self-serving adoption of [San Juan Unit Four] and [Palo Verde Unit Three] was ever addressed by the [HE] or the [PRC]." This claim is inconsistent with the record.

**{45}** In its final order, the PRC expressly noted that Rode's pre-filed testimony was prepared prior to the lengthy proceedings that led to the modified stipulation and determined that his testimony was not relevant. Moreover, the record reflects that PNM did consider and address Rode's concerns; in fact, O'Connell addressed Rode's concerns at some length. Ultimately, the PRC was persuaded that, to the extent Rode's testimony was relevant at all, it supported the stipulating parties' assessment that the supplemental stipulation was the best outcome. We will not second-guess this decision.

## III.    CONCLUSION

**{46}** The PRC accepted the HE's conclusion that the supplemental stipulation fairly and justly resolved the CCN proceedings. This conclusion was predicated on the HE's finding that the resource portfolio identified in the supplemental stipulation provides a net public benefit. As our discussion shows, this finding was supported by an abundance of evidence. The PRC's decision to file a notice proposing to dismiss the protests to PNM's 2014 IRP was a lawful exercise of the PRC's discretion. The merits of PNM's 2014 IRP, as measured by the appropriate statutory and regulatory standards, were comprehensively considered

during the stipulation and supplemental stipulation proceedings and those proceedings were open and accessible to all.  The PRC's final order is affirmed.

**{47}  IT IS SO ORDERED.**

                                    _____

                                    **JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**BARBARA J. VIGIL, Justice**

_____

**J. MILES HANISEE, Judge, sitting in designation**