This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: September 25, 2025**

**No. S-1-SC-40307**

**NEW ENERGY ECONOMY, INC.,**

      Appellant,

and

**ALBUQUERQUE BERNALILLO COUNTY WATER UTILITY AUTHORITY,**

      Intervenor-Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

      Appellee,

and

**PUBLIC SERVICE COMPANY OF NEW MEXICO,**

      Intervenor-Appellee.

**In the Matter of the Application of Public Service Company of New Mexico For Revision of Its Retail Electric Rates Pursuant to Advice Notice No. 595 NMPRC Case No. 22-00270-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

New Energy Economy
Mariel Nanasi

Santa Fe, NM

Freedman Boyd Hollander & Goldberg, PA
John W. Boyd
Albuquerque, NM

for Appellant

Erin E. Lecocq, Appellate Specialist
Santa Fe, NM

for Appellee

PNM Resources, Inc.
Stacey J. Goodwin, Associate General Counsel
Albuquerque, NM

Miller Stratvert, P.A
Richard L. Alvidrez
Albuquerque, NM

Peifer, Hanson, Mullins & Baker, P.A.
Charles R. Peifer
Matthew E. Jackson
Albuquerque, NM

for Intervenor-Appellee Public Service Company of New Mexico

**CONSOLIDATED WITH**

**No. S-1-SC-40340**

**NEW MEXICO DEPARTMENT OF JUSTICE,
COUNTY OF BERNALILLO,
ALBUQUERQUE-BERNALILLO COUNTY
WATER UTILITY AUTHORITY,**

　　Appellant,

v.

**NEW MEXICO PUBLIC REGULATION
COMMISSION,**

　　Appellee,

and

**PUBLIC SERVICE COMPANY OF NEW MEXICO,**

Intervenor-Appellee.

**In the Matter of the Application of Public Service Company of New Mexico for Revision of Its Retail Electric Rates Pursuant to Advice Notice No. 595 NMPRC Case No. 22-00270-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Raúl Torrez, Attorney General
Lawrence M. Marcus, Assistant Solicitor General
Gideon Elliot, Utilities Bureau Chief
Jocelyn Barrett, Assistant Attorney General
Santa Fe, NM

for Appellant New Mexico Department of Justice

Bernalillo County Attorney's Office
Marah deMeule, Lead Attorney
Valerie Joe
Albuquerque, NM

JAlbright Law, LLC
Jeffrey H. Albright
Albuquerque, NM

for Appellant County of Bernalillo

Stelzner, Winter, Warbuton, Flores & Dawes, P.A.
Nann M. Winter
Keith W. Herrmann
Albuquerque, NM

for Appellant Bernalillo County Water Utility Authority

Erin E. Lecocq, Appellate Specialist
Santa Fe, NM

for Appellee

PNM Resources, Inc.
Stacey J. Goodwin, Associate General Counsel
Albuquerque, NM

Miller Stratvert, P.A
Richard L. Alvidrez
Albuquerque, NM

Peifer, Hanson, Mullins & Baker, P.A.
Charles R. Peifer
Matthew E. Jackson
Albuquerque, NM

for Intervenor-Appellee Public Service Company of New Mexico

**DECISION**

**BACON, Justice.**

## I.  INTRODUCTION

**{1}**     This is a direct appeal from a Final Order of the New Mexico Public Regulation Commission (Commission) addressing the Public Service Company of New Mexico's (PNM) 2022 application for amended retail rates. Final Order, *In the Matter of the Application of Public Serv. Co. of N.M. for Revision of its Retail Electric Rates Pursuant to Advice No. 595*, Case No. 22-00270-UT (N.M. Pub. Regul. Comm'n Jan. 3, 2024). Appellants are the New Mexico Department of Justice (NMDOJ) (formerly, New Mexico Attorney General), the Albuquerque Bernalillo County Water Utility Authority (ABCWUA), Bernalillo County, and New Energy Economy (NEE).

**{2}**     Appellants present the following questions for our review: (1) Did the Commission act unlawfully or unreasonably in imposing an $84.8 million disallowance as a remedy for PNM's imprudent investments in the Four Corners Power Plant (Four Corners), which is less than the $238.7 million in excess costs caused by PNM's imprudence? (2) Did the Commission act unlawfully by allowing PNM a return of and partial return on $96.3 million in undepreciated investments in expired leases at the Palo Verde Nuclear Generating Station (Palo Verde)? (3) Did the Commission act unreasonably or unlawfully by deferring final decision on ratepayers' responsibility for any additional costs of decommissioning Palo Verde? and (4) Did the Commission act unlawfully by allowing PNM recovery of the total costs of compensating and insuring PNM's Board of Directors because the decision is contrary to prior Commission precedent and NMSA 1978, Section 53-11-35(D) (1987)?

**{3}**     We conclude that Appellants have not shown that the Final Order is unreasonable or unlawful. *See* NMSA 1978, § 62-11-4 (1965) ("The burden shall be on the party appealing to show that the order appealed from is unreasonable, or unlawful."). We therefore affirm the Final Order. *See* NMSA 1978, § 62-11-5 (1982) (providing that the Court "shall have no power to modify" the Commission's order, "but shall either affirm or annul and vacate the same"). We resolve this appeal by way of nonprecedential decision because the issues are decided by the presence of substantial evidence and under existing law. Rule 12-405(B)(1),(2),(3) NMRA.

## II. STANDARD OF REVIEW

**{4}** As the party challenging the Final Order, Appellants bear the burden to show that the order "is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *N.M. Indus. Energy Consumers v. N.M. Pub Regul. Comm'n*, 2007-NMSC-053, ¶ 13, 142 N.M. 533, 168 P.3d 105. When reviewing orders of the Commission, we recognize, "Commission decisions requiring expertise in highly technical areas, such as utility rate determinations, are accorded considerable deference." *Socorro Elec. Coop., Inc. v. N.M. Pub. Regul. Comm'n*, 2024-NMSC-017, ¶ 18, 557 P.3d 68 (internal quotation marks and citation omitted). But "[w]e accord less deference when reviewing determinations outside the realm of the Commission's expertise." *Id.* (internal quotation marks and citation omitted).

**{5}** We begin our review of a Commission order "by looking at two interconnected factors: whether the decision presents a question of law, a question of fact, or some combination of the two; and whether the matter is within the agency's specialized field of expertise." *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n (ABCWUA)*, 2010-NMSC-013, ¶ 17, 148 N.M. 21, 229 P.3d 494 (internal quotation marks and citation omitted). With respect to questions of law, we acknowledge that the Commission does not have expertise in statutory interpretation and "we afford little, if any, deference to the Commission on" these questions. *N.M. Indus. Energy Consumers*, 2007-NMSC-053, ¶ 19 (internal quotation marks and citation omitted). But we will grant more deference to the Commission's legal determinations which "implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28 (internal quotation marks and citation omitted).

**{6}** "With respect to questions of fact, we look to the whole record to determine whether substantial evidence supports the [Commission's] decision." *ABCWUA*, 2010-NMSC-013, ¶ 18 (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2015-NMSC-032, ¶ 9, 369 P.3d 133 (brackets, internal quotation marks, and citation omitted). "We view the record in the light most favorable to the Commission's decision, and we will not substitute our judgment for that of the Commission if the decision is supported by substantial evidence on the record as a whole." *Socorro Elec.*, 2024-NMSC-017, ¶ 20 (citations omitted). Finally, a Commission order is "arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand." *Albuquerque Cab Co., Inc. v. N.M. Pub. Regul. Comm'n*, 2017-NMSC-028, ¶ 8, 404 P.3d 1 (internal quotation marks and citation omitted).

## III.    DISCUSSION

**{7}** Appellants argue that the Final Order is unreasonable or unlawful because the Commission (1) disallowed only part of the excess costs caused by PNM's imprudence at Four Corners, (2) allowed PNM a return of and partial return on undepreciated investments in the utility's now-expired leases at Palo Verde, (3) deferred ruling on ratepayers' responsibility for any additional costs of decommissioning Palo Verde, and (4) allowed PNM to recover certain costs associated with PNM's Board of Directors. PNM and the Commission generally respond that the Final Order falls within the Commission's authority and discretion, is supported by substantial evidence, and is not arbitrary or capricious. We summarize the record as relevant to each issue before discussing the merits.

### A.    Remedy for PNM's Imprudent Investments in Four Corners

### 1.    Background to Four Corners remedy issue

**{8}** Four Corners is a coal-fired generating plant located near Fruitland, New Mexico. The Final Order disposes of longstanding issues surrounding the imprudence of PNM's decisions to extend its partial ownership interest in Four Corners, instead of abandoning that interest by the end of 2016, and to make certain life-extending capital improvements to the facility, including investing approximately $150 million towards a selective catalytic reduction pollution control system. These imprudence issues were first raised in PNM's 2016 Rate Case, Case No. 16-00276-UT. PNM denied the allegations of imprudence made in the 2016 Rate Case, but eventually stipulated that it would reduce its return on (i.e. profit on) the disputed investments to an amount based on its cost of debt. The Commission accepted this stipulation allowing PNM a debt-only return but decided to defer final action on the prudence issues to PNM's next rate case.

**{9}** PNM filed its next rate case in December of 2022. This is a direct appeal from that rate case. The Commission has found that PNM's decision to continue participating in Four Corners after 2016 was wasteful and that PNM's decision-making processes were inadequate. No party to this appeal challenges the Commission's findings of PNM's imprudence. We therefore accept that PNM imprudently decided to continue participating in Four Corners past 2016 and to make the disputed capital improvements to the facility.

**{10}** Appellants here challenge the remedy the Commission imposed for PNM's imprudence. The Commission found that PNM's imprudent decision to continue investing in Four Corners resulted in $238.7 million in excess costs or harm to ratepayers between 2017 and 2036. However, the Commission ultimately imposed only an $84.8 million additional disallowance for PNM's imprudence, which for regulatory purposes was expressed as an impairment on PNM's undepreciated investments in Four Corners. Adding in PNM's agreement in the 2016 Rate Case to receive a debt-only return on the disputed investments, the Commission's remedy amounts to a $113 million total disallowance for PNM's imprudent decision to continue investing in Four

Corners. PNM was allowed to recover a return of and a return on the remaining portion of its undepreciated investments in the facility.

**{11}** The Commission primarily based this remedy on the testimony of Dr. Jeremy Fisher, an expert witness called by intervenor Sierra Club (who is not a party to this appeal). Dr. Fisher testified that PNM's decision to continue investing in Four Corners caused ratepayers to be exposed to $238.7 million in excess costs between 2017 and 2036, with $115.5 million of these excess costs having been realized between 2017 and 2022. Dr. Fisher explained that the Commission could disallow either some or all of these excess costs as a remedy for PNM's imprudence. As a recommended remedy, Dr. Fisher suggested that the Commission disallow PNM a return on the capital costs it incurred at Four Corners from 2016 through 2022 and a debt-only return on capital costs incurred at Four Corners from 2023 through 2031. In response to a bench request, PNM calculated that Dr. Fisher's suggested remedy would equal a $84.8 million pre-tax disallowance on the facility.

**{12}** The Hearing Examiners assigned to this matter found that Dr. Fisher's testimony was credible and, in a Recommended Decision, rejected evidence and testimony presented by PNM and NEE recommending alternative remedies for PNM's imprudence. The Hearing Examiners explained that Dr. Fisher's recommended remedy was consistent with "sound and long-held regulatory principles: (i) a utility that has acted imprudently shouldn't profit on that imprudence; and (ii) the harm to ratepayers ensuing from the improvident utility decision-making should be redressed in a reasonably balanced manner." To this end, the Hearing Examiners explained that two "moderating" or "countervailing" factors advised against disallowing the full $238.7 million in ratepayer harm from PNM's rates.

**{13}** As the first moderating factor, the Hearing Examiners cited the "sheer passage of time since the issue of prudence was first fully litigated before the Commission in 2017 but deferred by a former Commission to PNM's next rate case." The Hearing Examiners suggested that the delay in resolving the Four Corners imprudence issues "is not the fault of PNM. Nor is the delay the fault of any one party in particular." Yet, as had been "forewarned" in the 2016 Rate Case, the delay in resolving these issues meant that "full recovery might be allowed for additional life-extending capital investments at Four Corners throughout the remainder of its service life."

**{14}** As the second moderating factor, the Hearing Examiners cited the fact that, "PNM has already tried, unsuccessfully, to abandon its interest" in Four Corners in a 2021 Abandonment Case, Case No. 21-00017-UT. The Hearing Examiners explained, "[h]ad PNM been successful in exiting Four Corners" in the 2021 Abandonment Case, "ratepayer exposure to [Four Corners] costs extending into an indefinite period of participation in the coal plant would have been reduced, perhaps substantially." The Hearing Examiners noted PNM had estimated its proposed abandonment would have saved customers between $30 million and $300 million over twenty years. The Hearing Examiners explained that, as a result of the failed abandonment proceeding, Four Corners "remains a certificated resource," which PNM will use "as a baseload resource

to serve customers in ordinary circumstances and some extraordinary ones, like extreme weather events."

{15} On the other hand, the Hearing Examiners emphasized, "[h]ad PNM not imprudently extended its participation in Four Corners beyond 2016, PNM would not have exposed ratepayers to substantial harm credibly quantified in this case as leading to net costs to ratepayers of $238.7 million between 2017 and 2036." The Hearing Examiners additionally suggested Four Corners was used, but not useful, in that PNM's continued investment in the facility was economically imprudent or wasteful. The Hearing Examiners thus recommended that disallowing "$84.8 million (or 32.4% of net plant) . . . effectively prevents PNM from *unduly* profiting on an imprudent and wasteful resource decision while also factoring into the remedy equation the extenuating factors militating against a full disallowance." The Hearing Examiners explained that this recommended remedy "protects captive ratepayers from the substantial harm resulting from being bound to Four Corners after 2016, . . . avoids imposing a disproportionately harsh penalty," and "serves as a deterrent to future acts of imprudence by PNM management."

{16} The Commission approved the Hearing Examiners' recommended remedy. The Commission agreed that any disallowance imposed on PNM should be mitigated due to the delay in resolving the prudency issues. The Commission found that neither PNM nor ratepayers were at fault for this delay and that the recommended $84.8 million disallowance "appropriately balances these competing interests of shareholders and ratepayers." The Commission also agreed that the unsuccessful abandonment of Four Corners justified reducing the disallowance imposed on PNM. The Commission explained, "The ultimate result of [the 2021 Abandonment Case] is that Four Corners remains a certificated generating resource serving PNM's customers. Four Corners's continued use carries value for PNM's customers. It is reasonable to recognize . . . the 'full measure of harm' should be mitigated to an extent, as the [Hearing Examiners] recommend[]."

## 2.     The Commission lawfully imposed a partial disallowance

{17} Appellants challenge the Commission's decision to impose a disallowance that is less than the full $238.7 million in ratepayer harm arising from PNM's imprudent decision to continue investing in Four Corners. Appellants argue that this partial disallowance is unlawful because the Commission was required to disallow the total amount of ratepayer harm. The Legislature has directed, "[e]very rate made, demanded or received by any public utility shall be just and reasonable." NMSA 1978, § 62-8-1 (1941). Appellants reason that any rate which charges ratepayers for any part of a utility's imprudence is unjust and unreasonable, and therefore, the Commission's remedy for PNM's imprudence is contrary to law.

{18} We conclude that the Commission lawfully imposed only a partial disallowance under the circumstances presented. By statute, the Commission is required to balance the interests of ratepayers and utility investors to ensure "reasonable and proper services shall be available at fair, just and reasonable rates," and "that capital

investment may be encouraged and attracted so as to provide for the construction . . . of proper plants and facilities and demand-side resources for the rendition of service to the general public and to industry." NMSA 1978, § 62-3-1(B) (2008). This Court has accorded significant discretion to the Commission in balancing these interests, requiring only that end rates fall within a broad zone of reasonableness that is neither so low as to confiscate the utility's property nor so high as to expose ratepayers to extortionate rates. *Att'y Gen. v. N. M. Pub. Regul. Comm'n*, 2011-NMSC-034, ¶ 13, 150 N.M. 174, 258 P.3d 453. We have long recognized, "[t]he Commission [is] not bound to the use of any single formula or combination of formulae in determining rates." *Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1977-NMSC-032, ¶ 70, 90 N.M. 325, 564 P.2d 588 (citing *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944) and *Fed. Power Comm'n v. Nat. Gas Pipeline Co.*, 315 U.S. 575 (1942)). Instead, we have emphasized, "the rate-making function involves the making of pragmatic adjustments. It is the result reached, not the method employed, which is controlling." *In re Petition of PNM Gas Servs.*, 2000-NMSC-012, ¶ 7, 129 N.M. 1, 1 P.3d 383 (quoting *Mountain States*, 1977-NMSC-032, ¶ 70).

**{19}** Notably, Appellants do not contend that the end rates imposed by the Commission fall outside of the zone of reasonableness so as to be confiscatory or extortionate. Appellants rather suggest that the Commission unlawfully applied the prudent investment theory itself. The prudent investment theory is a traditional ratemaking methodology which "provides that ratepayers are not to be charged for negligent, wasteful or improvident expenditures, or for the cost of management decisions which are not made in good faith." *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n (PNM)*, 2019-NMSC-012, ¶ 21, 444 P.3d 460 (quoting *Pub. Serv. Co. of N.M.*, 101 P.U.R. 4th 126, 151 (N.M. Pub. Serv. Comm'n 1989)). The Commission may not "pour a new meaning" into a statute, including Section 62-8-1's just and reasonable standard. *State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 28, 127 N.M. 272, 980 P.2d 55. The Commission also may not "radically depart[] from past practice without proper notice," including "previously established methods of ratemaking, absent a change in circumstances peculiar to the company and the pending case." *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1993-NMSC-032, ¶¶ 7-8, 115 N.M. 678, 858 P.2d 54 (internal quotation marks and citation omitted); *see also PNM Gas*, 2000-NMSC-012, ¶ 9 ("[T]he Commission is not free to disregard its own rules and prior ratemaking decisions or to change its position without good cause and prior notice to the affected parties." (internal quotation marks and citation omitted)). Appellants suggest that the Commission departed from prior application and understanding of the prudent investment theory by imposing only a partial disallowance for PNM's imprudent investments at Four Corners.

**{20}** However, "the commission may change its past practices or procedures, provided that substantial evidence on the record justifies such a change." NMSA 1978, § 62-6-14(C) (2009). Moreover, we have explained, "the prudent investment theory is but one of many accepted ratemaking methodologies," and as always, the ultimate inquiry remains whether the rates set by the Commission fall within the broad zone of reasonableness that is neither ratepayer extortion nor utility confiscation. *Citizens for Fair Rates & the Env't v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-010, ¶ 47, 503 P.3d

1138. Indeed, as we have repeatedly recognized, "[o]ur limited but vital role" in reviewing orders from the Commission "is to ensure that the end result of a rate order reasonably balances investor and ratepayer interests." *In re Application of Timberon Water Co., Inc.*, 1992-NMSC-047, ¶ 14, 114 N.M. 154, 836 P.2d 73 (quoting *Jersey Cent. Power & Light Co. v. Fed. Energy Regul. Comm'n,* 810 F.2d 1168, 1192 (D.C. Cir.1987)). Given the limited focus and scope of our review, we see no unlawfulness in the Commission's ratemaking decision to balance ratepayers' and the utility's interests when crafting a remedy for PNM's imprudent decision to continue investing in Four Corners past 2016.

{21} Our precedent confirms that the Commission retains significant discretion in crafting a reasonable remedy for a utility's imprudence and may either totally or partially disallow a utility's imprudent investments. *PNM*, 2019-NMSC-012, ¶¶ 39-47. In *PNM,* we addressed a direct appeal from PNM's 2015 Rate Case, Case No. 15-00261-UT. *PNM*, 2019-NMSC-012, ¶ 1. In the 2015 Rate Case, the Hearing Examiner had recommended that the Commission disallow all recovery of costs associated with PNM's imprudent decision to repurchase 64.1 MW of leased capacity at Palo Verde and to extend leases for an additional 114 MW of capacity at that facility. *Id.* ¶¶ 17, 20-24. The Commission disagreed and found that PNM could recover some, but not all, of these imprudently incurred costs. *Id.* ¶¶ 22-24. The parties on appeal challenged the Commission's partial disallowance, arguing that a total disallowance was required because "a utility should not be rewarded for its imprudent failure to reasonably consider alternatives." *Id.* ¶¶ 39, 47. While recognizing "that total disallowance *may be* an appropriate remedy for . . . imprudence in some circumstances," we affirmed the Commission's decision to impose a partial disallowance in light of "the particular facts and circumstances [and considering] the unique regulatory history of this Palo Verde capacity and the arguments of several parties that Palo Verde provides significant value to ratepayers." *Id.* ¶ 47 (emphasis added); *see also* § 62-6-14(A) ("When . . . it is necessary for the commission to consider or ascertain the valuation of the properties or business of a public utility . . . the commission shall give due consideration to the history and development of the property."). *PNM* thus holds that the Commission may impose either a total or partial disallowance for a utility's imprudence so long as the disallowance is reasonable in view of the circumstances. 2019-NMSC-012, ¶ 47. The opinion thus directly supports the Commission's authority to disallow only part of the excess costs caused by PNM's imprudent decision to continue investing in Four Corners as at issue here.

{22} Appellants nevertheless dispute this holding, emphasizing language quoted in *PNM* that, "because the purpose of a prudence review is to hold ratepayers harmless from any amount imprudently invested, a disallowance should equal the amount of the unreasonable investment." 2019-NMSC-012, ¶ 40 (quoting *In re Pacificorp, dba Pac. Power Request for a Gen. Rate Revision*, No. 12-493, 2012 WL 6644237 (Or. Pub. Util. Comm'n Dec. 20, 2012)). Appellants assert that this "hold ratepayers harmless" language requires that the Commission disallow an amount equal to the $238.7 million in extra costs caused by PNM's imprudence. We disagree. This "hold ratepayers harmless" language is a quote from a decision of the Oregon Public Utility Commission (Oregon PUC), which the Commission had relied on in PNM's 2015 Rate Case. *PNM*,

2019-NMSC-012, ¶ 40. When discussing how the Oregon PUC's decision supported the Commission's order, the *PNM* Court explained that the Oregon PUC had imposed a partial disallowance that was "reasonable in relationship to the potential harm to ratepayers *and led to just and reasonable rates*." 2019-NMSC-012, ¶ 41 (emphasis added) (brackets, internal quotation marks, and citation omitted). Thus, when read in context, the quoted language confirms that the Commission may impose a partial disallowance in view of the circumstances. *Id.*; *see also PNM Gas*, 2000-NMSC-012, ¶ 7 ("It is the result reached, not the method employed, which is controlling." (internal quotation marks and citation omitted)). We therefore reject Appellants' claim that the Commission is required to "hold ratepayers harmless" for a utility's imprudence in every case. We instead follow the holding in *PNM* that the Commission may impose either a total or partial disallowance so long as the remedy is reasonable in view of the circumstances. 2019-NMSC-012, ¶ 47.

**{23}**   Appellants also seek to distinguish *PNM* from the current appeal. For example, Appellants suggest that this appeal differs from *PNM* because the Commission here was able to precisely quantify the harm caused by PNM's imprudent decision to continue investing in Four Corners at $238.7 million in excess costs. In contrast, the Commission was unable to quantify the precise amount of harm to ratepayers arising from PNM's imprudence at Palo Verde in PNM's 2015 Rate Case. *See PNM*, 2019-NMSC-012, ¶¶ 39-42, 46. But we conclude that this is a distinction without a difference. In *PNM*, the parties argued that the Commission's remedy for PNM's imprudent investments at Palo Verde was unreasonable because the Commission could not precisely quantify the harm arising from PNM's imprudence. 2019-NMSC-012, ¶ 46. We disagreed, explaining that such imprecision was reasonable in view of the Commission's inability to quantify the harm to ratepayers. *Id.* We reasoned, "The Commission's treatment of [the imprudent investments at Palo Verde] in this ratemaking case was necessarily imprecise because . . . the very behavior that caused the need for a remedy—PNM's failure to consider alternatives—impaired the Commission's ability to quantify the potential harm to ratepayers from PNM's imprudence." *Id.* We did not suggest that the Commission's ability to quantify the harm arising from PNM's imprudence somehow defined the scope of the Commission's authority to decide on an appropriate remedy.

**{24}**   Appellants also try to distinguish *PNM* by emphasizing that the Commission found that Palo Verde was used and useful in PNM's 2015 Rate Case. *PNM*, 2019-NMSC-012, ¶ 43. Here, the Hearing Examiners suggested that Four Corners, while used by ratepayers, was not useful because continued investment in the facility was economically imprudent or wasteful. Appellants suggest that Four Corners's lack of usefulness requires the Commission to disallow the full $238.7 million in excess costs.

**{25}**   Again, we conclude that Appellants have not successfully distinguished *PNM*, 2019-NMSC-012, ¶ 47. Traditional ratemaking methodologies recognize that, to be included in a utility's rate base, a utility's investments should be "'used and useful' so as to inure to the benefit of consumers." *Att'y Gen.*, 2015-NMSC-032, ¶ 22. "To be considered 'used and useful,' a property must either be used, or its use must be forthcoming and reasonably certain; and it must be useful in the sense that its use is

reasonable and beneficial to the public." *PNM*, 2019-NMSC-012, ¶ 21 (brackets and citation omitted). However, "[o]ur case law confirms that the 'used and useful' concept is but one factor among many to be considered by the Commission in its rate base analysis. . . . [T]he touchstone is the reasonableness of the ultimate decision." *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 1986-NMSC-059, ¶ 29, 104 N.M. 565, 725 P.2d 244. Accordingly, the usefulness of Four Corners is but one factor for the Commission to consider in setting just and reasonable rates and does not control the Commission's discretion and authority in fixing a remedy for PNM's imprudence.

{26}    Moreover, we disagree with Appellants' characterization of the record with respect to the Commission's findings on Four Corners's usefulness. The Hearing Examiners suggested that Four Corners was used, but not useful, when explaining why PNM's wastefulness supported imposing a partial disallowance on the facility. However, this suggestion occurs only in the context of recommending a remedy for PNM's imprudence; the Hearing Examiners did not separately suggest that the Commission find that Four Corners is not used and useful. Additionally, the Commission in its Final Order found, "Four Corners's continued use carries value for PNM's customers." The Commission likewise directed, "To the extent that the Recommended Decision . . . expressly conflicts with this Final Order, this Final Order shall control." Viewing the record in the light most favorable to the Commission's decision, we conclude that the Commission rejected the suggestion that Four Corners was not useful and instead found that Four Corners is used and useful to ratepayers. *See Att'y Gen.*, 2015-NMSC-032, ¶ 22 (explaining that a facility is used and useful if it "inure[s] to the benefit of consumers"); *see also Alto Village Servs. v. N.M. Pub. Serv. Comm'n*, 1978-NMSC-085, ¶ 15, 92 N.M. 323, 587 P.2d 1334 ("[W]hether utility property is 'used and useful' and therefore to be included in the rate base is a factual determination."). Appellants thus have not distinguished the circumstances of this case from those as presented in *PNM*, 2019-NMSC-012.

{27}    In short, our precedent confirms that the Commission may impose a partial disallowance for a utility's imprudence so long as that partial disallowance results in just and reasonable rates. *Id.* ¶ 47. Appellants have not shown that the Commission's decision to balance PNM's and ratepayers' interests represents a radical departure from past practice or is otherwise contrary to law. Accordingly, we conclude that the Commission lawfully disallowed less than the total amount of excess costs caused by PNM's imprudent decision to retain partial ownership of Four Corners past 2016 and to make the disputed capital improvements to the facility.

### 3.    The Commission reasonably imposed a partial disallowance

{28}    Appellants also argue that the Commission's remedy for PNM's imprudence at Four Corners is unreasonable. For example, Appellants assert that the moderating factors cited by the Hearing Examiners are arbitrary and capricious. Appellants state that the Commission's reliance on the first moderating factor—the timing of the imprudence finding—"incorrectly absolving PNM for its role delaying resolution" of the prudence issues raised in the 2016 Rate Case, because "PNM could have filed a rate case at any time" and "[i]f anything the passage of time has exacerbated the harm to

ratepayers because they have had to continue paying for PNM's imprudent [Four Corners] investments." Similarly, Appellants argue that the second moderating factor cited by the Commission—PNM's unsuccessful attempt to abandon Four Corners in the 2021 Abandonment Case—does not mitigate the harm PNM's imprudent investment caused to ratepayers. Appellants correctly note that the Commission denied PNM's request to abandon Four Corners because the utility failed to identify adequate potential replacement resources as required by the Energy Transition Act, NMSA 1978, § 62-18-4(D) (2019). This Court affirmed the Commission's decision in the 2021 Abandonment Case on appeal. *See Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n*, S-1-SC-39138, dec. (N.M. July 6, 2023) (nonprecedential).

**{29}** While we acknowledge these as valid criticisms of the Commission's decision, we conclude that Appellants have not shown that the Final Order demonstrates "no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand." *Albuquerque Cab Co.*, 2017-NMSC-028, ¶ 8 (internal quotation marks and citation omitted). Despite PNM's ultimately unsuccessful attempt to abandon Four Corners, the Commission found that Four Corners "remains a certificated resource," which is still used to provide service and "carries value" for ratepayers. The Commission also found that neither PNM nor ratepayers could be faulted for the delay in resolving the prudence issues. The Commission's remedy therefore sought to balance the excess costs caused by PNM's imprudent decision to continue investing in Four Corners against the fact that the facility still provides necessary baseload capacity. We see a clear rational connection between the Commission's findings and ultimate conclusion that PNM should recover at least part of its investment in the facility. We therefore conclude that the Commission's decision is not arbitrary and capricious.

**{30}** Appellants also suggest that the Commission's order is unreasonable because certain comments made by two of the Commissioners in an open meeting deliberating on the Recommended Decision are not supported by substantial evidence. But our review focuses on whether the Final Order is supported by substantial evidence, not on comments made by individual Commissioners. *Cf. N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-015, ¶ 9, 450 P.3d 393 ("Our review is guided by whether substantial evidence supports the Commission's final order—not the hearing examiner's recommended decision."). And ample evidence supports the findings in the Final Order. The record shows that the $84.8 million impairment imposed by the Commission for PNM's imprudence at Four Corners will have the same financial impact as the remedy recommended by Dr. Fisher, the same expert who calculated that PNM's imprudence exposed ratepayers to $238.7 million in excess costs. The Hearing Examiners thoroughly examined the evidence presented on the Four Corners remedy issue and explained the reasons why they found Dr. Fisher's testimony and recommendations to be more credible than the other evidence. As the Commission's remedy is supported by Dr. Fisher's testimony, we conclude that the Final Order is supported by substantial evidence.

**{31}** Finally, Appellants claim that the Commissioners violated the Open Meetings Act, NMSA 1978, §§ 10-15-1 to -4 (1979, as amended through 2013), by discussing the

Recommended Decision with the Hearing Examiners in a closed session before the Commission's open meeting on the Final Order. The Commission responds that the discussions were in connection with the deliberations of an administrative adjudication and thus excepted from the Open Meetings Act by Section 10-15-1(H)(3). We do not reach this issue, however, as Appellants' arguments are unsupported by any analysis or citation to authority. *Nguyen v. Bui*, 2023-NMSC-020, ¶¶ 19-20, 536 P.3d 482 (explaining that the Court will not review undeveloped issues in the parties' briefs which are unsupported by cited authority). Accordingly, we conclude that Appellants have not shown that the Commission's order is unlawful or unreasonable and affirm the Commission's imposition of a $84.8 million impairment on Four Corners due to PNM's imprudence.

**B.      Allowance of Undepreciated Investments in Palo Verde**

**1.      Background to the Palo Verde undepreciated investments issue**

**{32}**    The Final Order also resolves multiple issues relating to Palo Verde. The Commission first granted PNM permission to participate as a partial owner of Palo Verde in 1977. Beginning in the mid-1980s, the Commission approved a series of transactions in which PNM simultaneously sold and leased-back a significant part of its ownership interests in the three Palo Verde generating units. Since then, the Commission has fixed rates so that PNM recovers its investments in Palo Verde over the operating life of each generating unit, instead of over the span of each lease, thus spreading out recovery of the costs associated with the facility over a longer period of time.

**{33}**    In PNM's 2015 Rate Case, the Commission found that PNM imprudently decided to extend its leases in 114 MW of capacity at Palo Verde Units 1 and 2. This Court affirmed the finding of imprudence on appeal. *PNM*, 2019-NMSC-012, ¶ 38.

**{34}**    In 2023 and 2024, PNM allowed its leases in the 114 MW of capacity to expire, reducing its interest in Unit 1 from 10.2% to 2.266667% and its interest in Unit 2 from 10.2% to 9.406667%. By then, PNM had expended $96.3 million in investments towards this leased capacity that had not yet been recovered in rates. PNM incurred approximately $45 million of this $96.3 million after the Commission's finding of imprudence in the 2015 Rate Case. In Commission Case No. 21-00083-UT, the Commission authorized PNM to create a pure accounting or regulatory asset for the $96.3 million in undepreciated investments, with ratemaking treatment of the regulatory asset to be determined in the 2022 Rate Case now on appeal.

**{35}**    In the current 2022 Rate Case, PNM asked that it be allowed to amortize and collect the $96.3 million in undepreciated investments from ratepayers over a twenty-year period beginning January 2024. The Hearing Examiners agreed with PNM's request, but recommended that PNM should be ordered to remove any return on the $45 million in investments incurred after the Commission's finding of imprudence in the 2015 Rate Case. The Hearing Examiners further suggested that PNM be allowed a

return of and return on the remaining $51.3 million incurred before the finding of imprudence.

**{36}** The Commission approved the Hearing Examiner's recommended ratemaking treatment of these undepreciated investments. While acknowledging that PNM was imprudent in extending the leases at Palo Verde, the Commission rejected an argument that it should totally disallow PNM a return of the investments in the facility. The Commission asserted that its precedent did not require taking a "maximal" disallowance for utility imprudence in every case. Additionally, the Commission explained that it "considers requests for stranded cost recovery based on the specific circumstances." The Commission also found, "Palo Verde has been a used, useful, and certificated asset since 1977, and it remains used, useful, and certificated today and for the foreseeable future."

## 2.    The Commission lawfully allowed a return of the Palo Verde investments

**{37}** Appellants argue that the Commission's decision to allow PNM a return of and partial return on its undepreciated investments in the expired Palo Verde leases is inconsistent with the Commission's past practice of disallowing a utility recovery of stranded costs. Appellants point to a 1998 Commission order in Commission Case No. 2761 which decided stranded costs are unrecoverable because they are a measure of utility inefficiency. PNM points out that this 1998 Commission order was vacated by this Court as part of our opinion in *Sandel*, 1999-NMSC-019, ¶ 30. *See In re Adjustments to Franchise Fees Required by the Elec. Util. Indus. Restructuring Act of 1999*, 2000-NMSC-035, ¶ 4, 129 N.M. 787, 14 P.3d 525 (noting that this Court vacated the Commission's final order in Case No. 2761). We therefore doubt the precedential import of the Commission's decision in Case No. 2761.

**{38}** But assuming that the decision in Case No. 2761 represents the Commission's past practice, we conclude that the Commission's decision to allow PNM these undepreciated investments here is lawful and reasonable. We again emphasize that the Commission has significant discretion in ratemaking decisions and may change past practices so long as the parties receive prior notice and substantial evidence supports that change. Section 62-6-14(C); *Hobbs*, 1993-NMSC-032, ¶ 8; *PNM Gas*, 2000-NMSC-012, ¶ 9. To the extent that the Commission may have departed from past practice in allowing recovery of stranded costs, the parties received notice of the change: The Commission notified the parties in 2021 that it would consider ratemaking treatment of the $96.3 million in undepreciated investments in PNM's 2022 Rate Case, and PNM specifically raised the issue in its application for amended retail rates. All parties were given the opportunity to present evidence and argument on this issue.

**{39}** The Commission also had substantial evidence on which to allow PNM a return of and partial return on these undepreciated investments. As explained by PNM Witness Joseph Miller, Jr., PNM's investments in Palo Verde were and are used and useful to ratepayers. Miller explained that the investments were necessary for regulatory compliance and also ensured that Palo Verde is available to provide service. PNM had not recovered these investments before expiration of the leases simply due to the

extended depreciation schedule fixed by the Commission. As explained by Miller, PNM's request for a regulatory asset to "recover the as yet unrecovered costs over a period of years" is "standard procedure for assets that have been used and useful but are no longer in service and have not been fully depreciated."

**{40}** Appellants also suggest that Palo Verde is no longer used or useful because the leases have expired and thus the Commission was required to disallow the investments from rates. The record specifically contradicts Appellants' argument, as the Final Order expressly finds that the Palo Verde assets are used and useful. *Alto Village*, 1978-NMSC-085, ¶ 15 (explaining that whether a facility is used and useful "is a factual determination"). Miller's testimony provides substantial evidence to support this finding.

**{41}** Similar to Appellants' arguments regarding Four Corners discussed above, Appellants also argue that the Commission must totally disallow the $45 million in undepreciated investments made after the finding of imprudence in the 2015 Rate Case. However, as discussed in the previous section, the Commission may impose a partial disallowance on a utility's imprudent investments. *PNM*, 2019-NMSC-012, ¶ 47. The Commission in this proceeding decided to disallow PNM a return on the $45 million in investments as a remedy for PNM's imprudence in extending the leases. Appellants have not demonstrated that this remedy is unreasonable. We therefore defer to the Commission's ratemaking decision.

## C. Palo Verde Additional Decommissioning Costs

### 1. Background to the Palo Verde decommissioning costs issue

**{42}** In the 2015 Rate Case, the Commission also found that PNM's imprudence at Palo Verde "exposed ratepayers to costs associated with nuclear decommissioning responsibilities that likely would not have been incurred had an alternative resource other than nuclear been selected." *PNM*, 2019-NMSC-012, ¶ 59 (brackets, internal quotation marks, and citation omitted). The Commission ordered that PNM be disallowed any future costs of decommissioning Palo Verde "in the event additional funding is required." *Id.* ¶ 61 (brackets, internal quotation marks and citation omitted). On appeal, this Court reversed and vacated the Commission's order disallowing these decommissioning costs because the Commission had not given PNM sufficient notice or a meaningful opportunity to be heard on the issue. *Id.* ¶¶ 62-65.

**{43}** In 2021, the Commission entered an order directing that the issue of whether the Commission should disallow the decommissioning costs "shall be addressed" in the current 2022 Rate Case. In its 2022 application for amended rates, PNM accordingly requested "a determination that customers are not subject to increased risk for nuclear decommissioning costs." PNM proffered evidence showing that the decommissioning trust funds were adequately funded and that no additional amounts were being requested or were necessary at the time. PNM also proffered that ratepayers were not exposed to additional decommissioning costs as a result of its decision to extend the leases, as PNM's long-held interests in Palo Verde meant that ratepayers would be responsible for the facility's decommissioning anyway.

**{44}** The Hearing Examiners recommended that the Commission defer final action on this issue. The Hearing Examiners noted that PNM had not asked for any additional decommissioning funding and explained, "[w]hether PNM should pay for decommissioning costs that may or may not exist in the future is a hypothetical issue at this juncture. This is dispositive." The Commission agreed with this recommendation and deferred ruling on the issue to an unspecified future proceeding.

### 2. The Commission lawfully and reasonably deferred final action

**{45}** Appellants argue that the Commission arbitrarily and capriciously decided to defer ruling on ratepayers' responsibility for the additional costs of decommissioning Palo Verde. Appellants point out that the Commission decided in the 2015 Rate Case that ratepayers were exposed to the risk of additional decommissioning costs from PNM's imprudence. Appellants assert that the Commission abruptly changed course in the 2022 Rate Case, finding that this risk is now "hypothetical." Appellants also argue that the Commission's decision to defer the issue contravenes the 2021 order in which the Commission specifically directed that the issue "shall be addressed" in the current rate proceeding. The Commission responds that it reasonably and lawfully declined to rule on the issue, as it had insufficient evidence and thus any decision would be speculative. PNM argues that the issue is not ripe.

**{46}** We conclude the Commission lawfully and reasonably deferred final action on the issue due to a lack of substantial evidence. *See, e.g.*, *PNM*, 2019-NMSC-012, ¶ 14 ("[W]e will not uphold the decision if it is not supported by substantial evidence." (internal quotation marks and citation omitted)). Although this issue was raised and discussed during the underlying proceedings, PNM showed that the decommissioning trusts were adequately funded and neither requested nor required additional funding. Appellants also do not point to any part of the record which would support a finding that PNM's imprudence exposed ratepayers to additional costs of decommissioning Palo Verde. We therefore agree that any decision on ratepayers' responsibility for these costs would have been speculative and that the Commission lawfully and reasonably deferred resolution of the issue until presented with sufficient evidence on which to make a decision.

**{47}** Additionally, we emphasize that the Commission decided not to take final action on ratepayers' responsibility for the additional decommissioning costs. This Court will only review agency actions that are final. *Citizens for Fair Rates*, 2022-NMSC-010, ¶ 27 ("Decisions of administrative entities are fit for review only when the agency's decision is final." (internal quotation marks and citation omitted)). "The determination of finality must be based on pragmatic consideration of the matters at issue and analysis of whether the administrative body has in fact finally resolved the issues." *N.M. Indus. Energy Consumers v. N.M. Pub. Serv. Comm'n*, 1991-NMSC-018, ¶ 24, 111 N.M. 622, 808 P.2d 592. "One factor that weighs heavily on our resolution of these [finality] issues is what the Commission has said it has done and will do." *Id.* ¶ 26. Here, the Commission has not said what it will do, but has indefinitely deferred the issue. The issue is not yet fit for review.

**D.     Allowance of Board of Directors Costs**

**1.     Background to the Board of Directors costs issue**

**{48}**   In its 2022 application for amended rates, PNM asked to recover costs associated with its Board of Directors, including Director & Officer insurance, investor relations expenses, and nearly $540,000 in board member compensation. ABCWUA objected to this request, arguing that a utility's board of directors operates primarily to protect the utility's shareholders and thus PNM's shareholders should split these costs evenly with ratepayers. ABCWUA cited the Commission's decision in Case No. 20-00104-UT, a rate case involving a different utility, El Paso Electric Company (EPE), in which the Commission split the costs of compensating EPE's board of directors evenly between ratepayers and shareholders.

**{49}**   In their Recommended Decision in PNM's 2022 Rate Case, the Hearing Examiners disagreed with ABCWUA and concluded that ratepayers should pay the total amount of these costs. The Hearing Examiners thought the decision in the 2020 EPE Rate Case, No. 20-00104-UT, did not clearly support splitting these costs. The Hearing Examiners additionally noted, "PNM also produced evidence at hearing that competent directors ensure the reliable and efficient provision of service. Competent directors will anticipate compensation." Finally, the Hearing Examiners suggested that Section 53-11-35(D) "contemplated that director actions should and may benefit a company's customers." The Hearing Examiners therefore recommended that PNM be allowed to recover the total amount of Board of Directors' compensation, insurance, and investor relations expenses.

**{50}**   ABCWUA, joined by NMDOJ and Bernalillo County, filed an exception to the Recommended Decision. The exception argued that the Hearing Examiners had misinterpreted both Section 53-11-35(D) and the 2020 EPE Rate Case, as these authorities more clearly supported the proposition that the costs should be split evenly between shareholders and ratepayers.

**{51}**   The Commission rejected the exception. While acknowledging that the Hearing Examiners may have "misinterpreted" the 2020 EPE Rate Case, the Commission was persuaded that the "other reasons" cited by the Hearing Examiners supported the recommendation to allow recovery of these costs. The Commission likewise agreed that Section 53-11-35(D) did not prohibit allocating these costs to ratepayers, as that statute "does not necessarily support the proposition that directors and customers have divergent interests." The Commission thus accepted the Hearing Examiners' recommendation to allow PNM full recovery of these costs.

**2.     The Commission lawfully allowed the Board of Directors costs**

**{52}**   Appellants argue that the Commission's decision to allow PNM full recovery of the Board of Directors' compensation, insurance, and investor relations costs is contrary to law. Appellants suggest that the Commission departed from its past precedent in the 2020 EPE Rate Case, despite acknowledging that the Hearing Examiners

misinterpreted that precedent. Appellants also assert that the Commission's decision is inconsistent with Section 53-11-35(D), a statute in the Business Corporations Act which addresses corporate governance. Appellants argue that this statute recognizes that directors do not equally consider both ratepayers and shareholders' interests, and thus shareholders should bear a portion of director-related expenses.

**{53}** We conclude that Appellants have not shown the Commission's decision is unlawful. Section 53-11-35(D) provides that a director of a corporation "shall consider the interests of the corporation's shareholders and, in [the director's] discretion, may consider . . . the interests of the corporation's . . . customers." Section 53-11-35(D)(1). While we acknowledge that Section 53-11-35(D) provides that a director of a corporation "shall" consider shareholders' interests and "may" consider customers' interests, we do not view the Final Order as inconsistent or contradictory to this language. The Commission reasoned that Section 53-11-35(D) provides that directors may consider ratepayers' interests and thus shareholder and ratepayers interests are not necessarily misaligned. The Commission's reasoning is not contrary to the plain language of Section 53-11-35(D).

**{54}** We also conclude that the Commission lawfully departed from the decision in the 2020 EPE Rate Case. We have previously recognized that the Commission must set rates that are "evidence-based, cost-based [and] *utility specific.*" *N.M. Att'y Gen.*, 2011-NMSC-034, ¶ 18 (emphasis added). As PNM points out, the Commission has routinely allowed PNM recovery of these costs in its past rate cases.

**{55}** Further, as noted above, the Commission may change past practices if prior notice and substantial evidence support that change. Section 62-6-14(C); *Hobbs*, 1993-NMSC-032, ¶ 8. The Commission's decision to allow these costs in this 2022 Rate Case is supported by substantial evidence. PNM witness Kyle Sanders explained that Board of Directors' compensation and insurance costs are critical to "attracting qualified individuals to oversee and provide appropriate governance to management[,] . . . providing for the most efficient overall management and running of a utility. This efficiency and governance benefits customers as well as shareholders." Sanders also testified that ratepayers' and utility shareholders' "interests are aligned, as customers expect safe, reliable and affordable power and shareholders expect a return on their investment that is funded to achieve these goals for customers."

**{56}** Appellants suggest that Sanders' testimony is speculative and that we should not grant it "any evidentiary weight." But we will not reweigh evidence on review of a Commission's order. *N.M. Indus. Energy Consumers*, 2019-NMSC-015, ¶ 13. Rather, "[w]e view the evidence in the light most favorable to the Commission's decision, and draw every inference in support of the Commission's decision." *N.M. Indus. Energy Cons.*, 2007-NMSC-053, ¶ 24 (citation omitted). Viewing the record in the light most favorable to the Final Order, we conclude Sanders' testimony provides substantial evidence supporting the Commission's decision. We therefore defer to the Commission's ratemaking decision to allow PNM recovery of the total costs of its Board of Directors compensation, insurance, and investor relations expenses. *See Albuquerque Cab Co.*, 2017-NMSC-028, ¶ 9 ("When a final order turns on an agency's

determination of matters within its special expertise, this Court gives heightened deference to the agency's determination.").

## IV. CONCLUSION

**{57}** For the foregoing reasons, we conclude Appellants have not shown that the Final Order is unreasonable or unlawful. We therefore affirm and remand this matter to the Commission.

**{58} IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**